## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**RONALD L. ALLEN, JR.,**

       **Plaintiff,**

v.

                                 **Civil Action No.  5:05CV199**
                                 **(The Honorable Frederick P. Stamp, Jr.)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant" and sometimes "the Commissioner") denying the Plaintiff's claim for Child's Insurance Benefits and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Ronald L. Allen ("Plaintiff") previously received Child's Insurance Benefits on the wage record of his father, Ronald L. Allen, Sr. (R. 36, 65). Those benefits were terminated due to Plaintiff's age and student status (R. 36).

On August 15, 1980, Plaintiff, through his mother, Charlotte A. Allen, filed an application for SSI on his own behalf (R. 36, 151-54). On December 22, 1983, Administrative Law Judge ("ALJ") Philip L. Moore found Plaintiff's condition had significantly improved, Plaintiff was no longer

disabled, and Plaintiff's disability ceased in July 1983. Consequently, Plaintiff's SSI income ended on September 30, 1983 (R. 427).

In December 1991, Plaintiff requested a review of his August 15, 1980, SSI case under the guidelines promulgated in <u>Zebley v. Sullivan</u>, 493 U.S. 521 (1990), a case that mandated the expansion of the rules by which the Social Security Administration decided a child's claim (R. 453-55, 456). On September 1, 1993, Plaintiff's review was granted and he was awarded SSI payments with the adjudication date of August 16, 1993 (R. 36, 456-60).

On June 6, 1997, Plaintiff filed an application for Child's Insurance Benefits (Disability) on the wage record of his father (R. 36). The claim was denied initially and on reconsideration, and a request for hearing was timely filed (R 36, 764, 766, 769).

In accord with then existing Public Law 104-193, when Plaintiff attained the age of eighteen, his award of benefits was re-determined to decide if he met the test for disability. Plaintiff was notified on October 21, 1997, that he did not meet the test for disability as an adult and that his SSI benefits ceased in October 1997 (R. 36, 464-66, 610). Plaintiff's last SSI payment was scheduled to be December 1997; however Plaintiff elected to receive continued benefits on his concurrent Title XVI and Title II claims pending the outcome of his appeal of this re-determination (R. 465, 467). A hearing on this determination was held on February 17, 1998, at which Plaintiff; Lori Haggerty, Plaintiff's case manager at United Summit Center; Charlotte Griffith, Plaintiff's mother; and Elsie Patterson, Plaintiff's great aunt, were present. Steve Nicholson presided as the hearings officer (R. 483-88). Plaintiff was found to be not disabled and the decision to terminate Plaintiff's SSI benefits was affirmed on February 23, 1998 (R. 489, 491-93).

On June 12, 1998, Plaintiff requested an administrative hearing, and ALJ Donald T. McDougall conducted the hearing on July 21, 1999, on the June 6, 1997, petition and the decision relative to the re-determination of Plaintiff's Child's Insurance Benefits (Disability) (R. 65, 74). On September 7, 1999, ALJ McDougall issued a decision finding Plaintiff was not entitled to Disabled Adult Child's Insurance Benefits and denied Plaintiff's June 6, 1997, claim. The ALJ also found Plaintiff's disability ceased in October 1997 and that his entitlement to SSI payments terminated on December 31, 1997 (R. 36, 74). On November 1, 1999, Plaintiff requested review of the ALJ's decision by the Appeals Council. He filed an amended request for review by the Appeals Council on January 18, 2000 (R. 36-37). On November 3, 2001, the Appeals Council issued an order vacating the ALJ's September 7, 1999, decision and remanding the case to the ALJ for further proceedings; specifically, the Appeals Council instructed the ALJ to give consideration to the examining source opinion; obtain additional evidence concerning Plaintiff's mental impairments; further evaluate Plaintiff's mental impairments; give further consideration to Plaintiff's maximum residual functional capacity; provide appropriate rationale with specific references to evidence of record in support of Plaintiff's RFC; obtain evidence, if necessary, from a medical expert to clarify whether Plaintiff's impairments met or equaled listings; and expand the record, if necessary to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base (R. 1035-38).

Plaintiff filed an application for SSI, dated January 31, 2001, alleging disability since August 27, 1979, due to cerebral palsy and mild atrophy of left leg (R. 1026-27, 1028, 1052-55). On February 8, 2001, Plaintiff filed an application for Child's Insurance Benefits on the wage record of his stepfather, James D. Griffith, alleging disability since August 27, 1979, due to cerebral palsy and mild atrophy of the left leg (R. 1149-50, 1151, 1056-65). The Appeals Council, in its November 3, 2001,

Order, directed the ALJ to attempt to locate Plaintiff's January 31, 2001, application and consolidate it with the application dated June 6, 1997, for hearing and decision purposes (R. 37, 1038).

On October 1, 2002, ALJ Barbara Gibbs conducted a hearing on Plaintiff's June 6, 1997, January 31, 2001, and February 8, 2001, applications, at which Plaintiff, who was represented by counsel; Dr. Lawrence Ostrowski, a vocational expert ("VE"); and James D. Griffith, Plaintiff's stepfather, testified (R. 37, 86-150). On November 18, 2002, ALJ Gibbs issued a decision, finding Plaintiff was not disabled because he could perform a significant range of light work (R. 36-49). On December 2, 2002, Plaintiff requested review of the ALJ's decision by the Appeals Council (R. 32). On November 18, 2005, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 22-24).

## II. FACTS

Plaintiff was born on August 27, 1979, and was twenty-three years old at the time the ALJ issued her November 18, 2002, decision (R. 49, 93, 151). Plaintiff graduated from high school through participation in special education classes (R. 114, 1063). Plaintiff resided with his mother and stepfather (R. 104). Plaintiff has never been gainfully employed (R. 90).

On April 23, 1980, Plaintiff was evaluated at the Central District Mental Health Center, Inc., located in Clarksburg, West Virginia, upon referral of his mother. Plaintiff was eight-months old. Pam Corley, the therapist who administered the tests, found the following: Plaintiff showed delays in the gross motor area with regard to his "head lag when pulled to sit, sitting without support and standing-bearing weight on his legs" on the Denver Developmental Screening Test (DDST); and Plaintiff functioned at the three month level in gross motor ability on the Milani test (R. 204). Ms. Corley's diagnostic impression was for infantile cerebral palsy (R. 204).

4

On July 3, 1980, when Plaintiff was a little more than ten-months old, a psychological evaluation was conducted of him by Barbara D. Ingersoll, Ph.D. Dr. Ingersoll found Plaintiff's "intellectual and psychosocial functioning in the mildly/borderline retarded range" She opined the test scores were not very reliable due to Plaintiff's age (R. 234).

On July 7, 1980, Ruth M. Phillips, M.D., corresponded with Barbara Burkart, a physical therapist at the Central District Mental Health Center. Dr. Phillips opined Plaintiff's speech was "functioning receptively and expressively at a 6 month level," which represented a "mild delay." Dr. Phillips also opined Plaintiff's social maturity was at the six-month level (R. 229, 231).

On October 24, 1980, Plaintiff, aged fourteen months, underwent an internal medical evaluation, which was conducted by James Henderson, M.D. Dr. Henderson observed Plaintiff could feed himself and play "pattycake." Dr. Henderson noted Plaintiff could drink from a cup, stand but not walk, hold objects, pull himself into a sitting position, and speak one or two words (R. 196). Dr. Henderson's physical examination of Plaintiff revealed normal senses, eyes, chest, heart, abdomen, extremities, neurological and musculoskeletal conditions. Dr. Henderson concluded Plaintiff functioned on a "level of approximately a 10 to 11 month old." Dr. Henderson opined his evaluation of Plaintiff revealed "only very mild psychomotor retardation." His impression was for "history of cerebral palsy with borderline psychomotor retardation" (R. 197).

On December 9, 1982, Pam George, an infant teacher at the Summit Center for Human Development, completed a termination summary of Plaintiff from his physical therapy sessions, which included "cognitive, social and language stimulation." She noted Plaintiff's "IEP goals were not met" because Plaintiff's class attendance was erratic and that Plaintiff's mother would not attend the clinic with him (R. 220).

On July 5, 1983, when Plaintiff was three-years, ten-months old, James R. Dollison, M.D., evaluated Plaintiff. Dr. Dollison noted Plaintiff was hyperactive and alert. Plaintiff was "appropriately responsive, asking questions about objects in the room." Plaintiff's attention span was noted as "short." Dr. Dollison's neurological examination revealed Plaintiff's visual and ocular functions were normal. Dr. Dollison observed Plaintiff's gait was stiff but with full ambulation, his grip strength was good, and his "sensory modalities appeared intact, bilaterally" (R. 241). Dr. Dollison's impression was for "cerebral palsy, Grade II, with psychomotor retardation, failure to reach normal development milestones, and hyperactivity, with evidence of minimal brain damage and some focal neurologic deficit, with a left-sided dystonia" (R. 241-42). Dr. Dollison found Plaintiff had "good retentative [sic] ability and some apparent good function insofar as language [was] concerned." Dr. Dollison opined Plaintiff should undergo full rehabilitation, as he was "trainable in the future if given sufficient educational exposure" (R. 242).

On August 24, 1983, Lynnda M. Dahlquist, Ph.D., completed a psychological evaluation of Plaintiff, who was four-years old, upon referral by the "Rehabilitation Clinic at WVU Medical Center in order to assess his developmental progress." Dr. Dahlquist noted that even though Plaintiff "cooperated with instructions well enough to allow for completion of the evaluation, . . . the present findings may not reflect his best effort, and therefore should be interpreted cautiously." Dr. Dahlquist administered the Stanford Binet Intelligence Scale test to Plaintiff. Plaintiff passed the two-year level of that test and he had "scattered success up to the 41/2 year level." Plaintiff's performance "resulted in a mental age score of two years 11 months and a corresponding IQ score of 62." Dr. Dahlquist opined Plaintiff was approximately twenty-five percent developmentally delayed for his age. Dr. Dahlquist noted Plaintiff's "[v]erbal explanation emerged as a relative strength" (R. 227).

On April 15, 1985, Kathleen Klaus Strosser completed a Psychoeducational Evaluation of Plaintiff. Ms. Strosser found Plaintiff's results on the Kaufman Assessment Battery for Children showed his mental processing composite was at the tenth percentile, which placed Plaintiff in the "low average range of intellectual functioning when compared to his peers." Plaintiff refused to follow directions for completion of the Bracken Basic Concepts Scale; therefore, no scores were obtained for that test (R. 613). Plaintiff scored at the low functioning level on the Vineland Adaptive Behavior Scale (R. 613-14). Ms. Strosser concluded Plaintiff functioned in the low average range of ability. She noted Plaintiff qualified for placement in a self-contained class for the behaviorally disordered and recommended he continue speech therapy services and he be "mainstreamed with early childhood education classes for physical education and other activities" (R. 614).

On July 1 and July 8, 1985, Jo Ledwell, Ph.D., completed a Psychological Assessment of Plaintiff. Dr. Ledwell administered the Stanford-Binet Intelligence Scale, Form L-M, to Plaintiff. Plaintiff's IQ was scored at seventy-one, which was borderline (R. 385).

In November, 1986, on the 3rd, 7th, and 10th, Plaintiff underwent a Psychological Evaluation, which was completed by Vicki Verdeyen, Ed.D., at the Summit Center for Human Development. Plaintiff was aged seven. Plaintiff was a full-time kindergarten student, having failed kindergarten the previous year (R. 386). Plaintiff scored in the average range of intelligence and in the lower extreme range of achievement on the Kaufman Assessment Battery for Children. Dr. Verdeyen noted Plaintiff was "losing some ground in terms of his achievement" when these scores were compared to previous scores (R. 387). On the Vineland Adaptive Behavior Scale, Plaintiff's score was "moderate." Plaintiff was found to have "mild deficits" in the communication domain, was found to have "moderate deficits" in the daily living skills domain, and was found to have "mild deficits" in the socialization

domain. Dr. Verdeyen noted it was possible Plaintiff was not performing up to his ability because of "overprotective parenting techniques." Dr. Verdeyen found the following: Axis I – attention deficit disorder with hyperactivity; Axis II – diagnosis deferred; Axis III – physical conditions and disorders – infantile cerebral palsy (R. 388).

On July 20, 1987, Ms. Strosser completed a Psychoeducational Evaluation of Plaintiff. She found Plaintiff scored in the low average range of intellectual functioning on the Wechsler Intelligence Scale for Children-Revised (R. 390). Ms. Strosser noted Plaintiff's true "functioning may be closer to the average range of ability" and opined Plaintiff's "[b]ehavior [had] improved considerably over the initial evaluation which was completed in April of 1985" (R. 391).

On March 11, 1988, Joan E. Beard completed an Occupational Therapy Evaluation Report of Plaintiff. Ms. Beard found Plaintiff experienced difficulty focusing and sustaining attention; he was cooperative and motivated; he demonstrated decreased gross motor coordination and fine motor dexterity; he demonstrated signs of "slight tactile defensiveness"; he scored well within his age range on the Developmental Test of Visual Motor Integration; and he did well in the visual-perceptual aspects (R. 401-03).

On April 25, 1988, Plaintiff underwent a neuropsychological evaluation at West Virginia University Hospital. The examiners found Plaintiff showed "fairly clear signs of wide spread neurobehavioral dysfunction" (R. 406). The following was observed: Plaintiff's visual spatial sequential memory was graded at a five year old's level; his tactile and receptive skills were impaired; he demonstrated right-left confusion; Plaintiff was highly active; he had difficulty concentrating; his behavior was not very well controlled; discipline at home was a problem; and he had an unspecified organic impairment (R. 407-08).

8

Based on the April 25, 1988, evaluation, Michael D. Franzen, Ph.D., opined Plaintiff would benefit from "one-to-one tutoring" and the implementation of a behavioral program at home (R. 405).

On May 24, 1989, Plaintiff was evaluated by Ira Gubernick, M.D., who opined Plaintiff was not hyperreflexic, his lower extremity reflexes were symmetric, he had intact light touch sensation, his motor strength was "5-" in the lower and upper extremities, and he had no scoliosis. Dr. Gubernick prescribed a strengthening and endurance program for Plaintiff (R. 410).

On July 18, 1989, Stephen W. Pollard, M.D., Ph.D., completed a Psychiatric Review of Plaintiff (R. 339). Dr. Pollard found Plaintiff's organic mental disorder was in the form of attention deficit disorder (R. 341). Dr. Pollard opined Plaintiff did not have a severe impairment (R. 344).

On January 9, 1991, a third Psychoeducational Evaluation was completed on Plaintiff. Jill DeiCas, a school psychologist, who administered the evaluation, found Plaintiff scored the following on the WISC-R: Verbal IQ was eighty-two; Performance IQ was ninety-one; and Full Scale IQ was eighty-five (R. 636). Plaintiff's written language and reading skills showed "severe discrepancy" (R. 637). Ms. DeiCas noted Plaintiff was receiving "all of his academic classes within the learning disability program." Ms. DeiCas found Plaintiff's cognitive ability was low average and Plaintiff was four years behind his current grade placement in reading and written language and two years behind his current grade placement in math (R. 639). Ms. DeiCas opined Plaintiff should continue to receive services within the "LD program" (R. 639).

On December 5, 1992, G. David Leveaux, M.D., corresponded with the Summit Center for Human Development. He wrote he had treated Plaintiff since January, 1992, for Childhood Attention Deficit Disorder. Dr. Leveaux noted he had prescribed Ritalin to Plaintiff for treatment of that condition (R. 990).

On February 26, 1993, Plaintiff's teacher, Ricky Murray, completed a Teacher's Questionnaire of Plaintiff. He wrote Plaintiff was in the "Specific Learning Disabilities Program," in which he was placed "in all regular classes but does receive support from the learning disabilities teachers." Mr. Murray opined Plaintiff had "the potential to do much better and more than he is doing" (R. 593). Mr. Murray noted Plaintiff was not disruptive, he did little work, he often attended to "stimuli other than what the teacher" expected, and he did not associate "much" with his peers (R. 594).

On May 8, 1995, Plaintiff was evaluated by David Ward, M.D., of the Morgantown Orthopedic Clinic. Plaintiff was fifteen-years, eight-months old. Dr. Ward noted Plaintiff had "very mild" cerebral palsy. He observed Plaintiff was "getting along pretty well without any real restrictions" and had been riding his bicycle. Dr. Ward opined Plaintiff had no functional limitations and could continue activities as he tolerated them (R. 873).

On July 2, 1996, Frank D. Roman, Ed.D., completed a Psychoeducational Evaluation of Plaintiff, who was aged sixteen years, ten months. Dr. Roman noted Plaintiff had done poorly in school that year and was scheduled to repeat the ninth grade. Plaintiff scored the following on the WISC-III: Verbal IQ was seventy-nine; Performance IQ was seventy-four; and Full Scale IQ was eighty (R. 864). Plaintiff scored the following on the WIAT: reading was scored at sixty-one; spelling was scored at fifty-eight; and written expression was scored at sixty-four. Dr. Roman opined Plaintiff qualified to remain in the "LD Program," but noted the "typical classroom setting [was] not conducive" to Plaintiff "meet[ing] success" (R. 865). Dr. Roman recommended Plaintiff attend technical school (R. 866).

On September 9, 1996, Eric Jones, M.D., evaluated Plaintiff at the Morgantown Orthopedic Clinic. He noted Plaintiff had mild spastic quadriparesis, he ambulated fully, and he had increased

10

back pain. Dr. Jones recommended physical therapy relative to Plaintiff's balance activities, neck and back, posture, and range of motion. Dr. Jones noted Plaintiff was able to do "regular things pretty much" (R. 875).

On February 3, 1997, Plaintiff began behavior management at United Summit Center, Inc. Plaintiff reported he had transferred to Tri-County High School, which offered classes "tailored to his level," and that he was doing better in school (R. 878).

On April 28, 1997, Plaintiff's teachers completed Teacher/School Personnel Questionnaire[s] regarding Plaintiff.

●Julia Wise, Plaintiff's English teacher, noted Plaintiff was intermittently involved with class and lessons, could not stay on task, and was not "keeping up with the class pace" (R. 826). Ms. Wise noted Plaintiff's vocabulary was above average. Plaintiff was noted to be less mature than his peers. Ms. Wise opined Plaintiff needed "one-one attention more than most students" (R. 827).

●Daniel Phares, Plaintiff's science teacher, opined Plaintiff was working at his LD placement potential (R. 831). Mr. Phares noted Plaintiff had difficulty comprehending oral and written work, could not complete assignments without assistance, possessed good keyboarding skills, had poor communication skills, appeared to be a "'loner'" when interacting with other students, exhibited no behavior problems, was not distracted in class, stayed "on task" when assignments were computer generated, and had very low self esteem (831-35).

●Judy Hoover, Plaintiff's math teacher, opined Plaintiff was able to understand concepts in the lower level math class, stayed on task, completed work, was a "loner," did not relate to other students, and was easily distracted (R. 836-39).

●Fredi Lynch, one of Plaintiff's teachers, noted Plaintiff spelled on a second or third grade level, enjoyed reading books at his level, accomplished about fifty percent of what the other LD students accomplished, socialized better, craved attention, and became distracted easily (R. 841-44).

●Jeff Hamrick, Plaintiff's social studies teacher, opined Plaintiff was not working at grade level, had difficulty maintaining the class pace, did not read at grade level, demonstrated appropriate communication skills, and was cooperative, (R. 846-50).

On June 27, 1997, Lori Haggerty, Plaintiff's case manager at United Summit Center, Inc., noted Plaintiff had been receiving behavior management to assist him with daily living skills and that Plaintiff was a volunteer for the Harrison County Parks and Recreation (R. 885).

On August 25, 1997, B. G. Thimmappa, M.D., evaluated Plaintiff for the West Virginia Disability Determination Service (R. 886). Dr. Thimmappa noted Plaintiff had a history of impaired hearing, and he had impaired vision, which was corrected by wearing glasses. Dr. Thimmappa's examination of Plaintiff's nose, throat, cardiovascular system, physical system, vital signs, skin, nails, HEENT, neck, chest, breasts, lungs, spine, extremities, neurological, and joints revealed normal results (R. 886-88). Plaintiff's respiratory examination was positive for a history of asthma, and his gastrointestinal tract examination was positive for "stomach trouble" and nausea (R. 887). Dr. Thimmappa's impression was for history of cerebral palsy and history of asthma (R. 888).

On September 4, 1997, Fulvio R. Franyutti, M.D., a state-agency physician, completed a Residual Physical Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations (R. 891-97).

On September 25, 1997, Tina M. Yost, M.A., a supervised psychologist at Levin & Associates, Complete Psychological Services, completed a Psychological Evaluation (Adult Mental Profile) of

Plaintiff. Plaintiff was eighteen years old. Plaintiff reported his presenting symptoms were "problems with 'reading, writing and sometimes with remembering things'" (R. 899). Ms. Yost observed Plaintiff to be cooperative, motivated and pleasant. She found his behavior was appropriate, eye contact was normal, speech was normal, communication was adequate, affect was normal, mood was normal, thought process and content were normal, insight and judgment were average, immediate and recent memories were impaired, abstract thinking was limited, and psychomotor behavior was unremarkable. On the WAIS-R, Plaintiff scored the following: Verbal IQ was seventy-six; Performance IQ was ninety; and Full Scale was eighty (R. 900). On the WRAT-III, Plaintiff scored the following: third grade in reading; fourth grade in spelling; and fifth grade in arithmetic. Ms. Yost's diagnostic impression was as follows: Axis I – diagnosis deferred; Axis II – diagnosis deferred; and Axis III – cerebral palsy, headaches and physical pain as reported by Plaintiff. Ms. Yost found Plaintiff's social functioning was appropriate, but that he was "somewhat socially isolated." Ms. Yost opined Plaintiff's concentration was somewhat impaired and that his pace was "generally within normal limits." Ms. Yost found Plaintiff was capable of understanding and carrying out simple instructions (R. 901).

On October 14, 1997, Mr. Phares completed another Teacher/School Personnel Questionnaire of Plaintiff. He noted Plaintiff was working at grade level and stayed on task, even though Plaintiff had difficulty comprehending subject material. Plaintiff completed assignments (R. 854). Mr. Phares noted Plaintiff "[a]ppear[ed] to have difficulty expressing himself." Mr. Phares observed Plaintiff had a good relationship with both him and Plaintiff's classmates. Plaintiff was observed to be "timid" and "at times withdrawn" (R. 855). Mr. Phares noted he had not observed an "attention problem" with Plaintiff (R. 857).

On October 17, 1997, Joseph Kuznair, Ed.D., a state-agency psychological consultant, completed a Mental Residual Functional Capacity Assessment of Plaintiff. Dr. Kuznair found the following: Plaintiff was not significantly limited in his ability to remember locations and work-like procedures and his ability to understand and remember very short and simple instructions (R. 911). Dr. Kuznair found Plaintiff was moderately limited in his ability to understand and remember detailed instructions. Dr. Kuznair found Plaintiff was not significantly limited in the following abilities: carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal work-day and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Kuznair found Plaintiff was moderately limited in his ability to work in coordination with or proximity to others without being distracted by them, in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and in his ability to respond appropriately to changes in the work setting (R. 911-12). Dr. Kuznair opined Plaintiff "retain[ed] the capacity to engage in simple routine work or vocational training" (R. 914).

On December 3, 1997, Plaintiff's teacher, Jeffrey Hamrick, completed a Teacher/School Personnel Questionnaire of Plaintiff. Mr. Hamrick noted Plaintiff was "not working at grade level but [was] working at level in his program placement." Plaintiff was able to maintain pace with the class, which was modified for him (R. 597). Mr. Hamrick opined Plaintiff communicated in an age-appropriate manner and related appropriately to his peers (R. 598).

On December 9, 1997, Ms. Haggerty, Plaintiff's case manager at United Summit Center, noted Plaintiff "had been receiving and should continue to receive Behavior Management to assist him in daily living skills" (R. 730).

On January 16, 1998, Hugh Brown, a state-agency physician, completed a Residual Physical Functional Capacity Assessment of Plaintiff. Dr. Brown found Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations (R. 731-35).

On January 22, 1998, Samuel Goots, Ph.D., a state agency psychological consultant, completed a Mental Residual Functional Capacity Assessment of Plaintiff. Except for opining Plaintiff was moderately limited in his ability to understand and remember detailed instructions and his ability to carry out detailed instructions, Dr. Goots found Plaintiff presented no evidence of limitations in any sub-category of the following categories: Understanding and Memory, Sustained Concentration and Persistence, Social Interaction, and Adaptation (R. 739-40). Dr. Goots found Plaintiff's activities of daily living and social functioning were not significantly limited. He found Plaintiff's severe impairments did not meet a listing and did not "substantially reduce his ability to function." Dr. Goots also found Plaintiff retained the "capacity to understand and follow routine, 3 & 4 step work-related activities with ordinary supervision" (R. 741).

On February 24, 1998, a chest x-ray was made of Plaintiff's lungs and revealed a "normal chest" (R. 1081).

On August 21, 1998, Ralph E. Van Atta, Ph.D., of United Summit Center, Inc., completed a Psychological Evaluation of Plaintiff (R. 1082). Dr. VanAtta "observed no gross or fine motor incoordination." Plaintiff stated he experienced sleep disturbance in the form of early waking. Plaintiff informed Dr. VanAtta he had few friends. Plaintiff scored the following on the WAIS-III:

Verbal IQ was seventy-three; Performance IQ was eighty-nine; and Full Scale IQ was seventy-eight (R. 1083). Based on Dr. VanAtta's interview of Plaintiff, review of Plaintiff's United Summit Center's chart, interview with Plaintiff's mother, review of disability hearing officer's report, and Plaintiff's scores on the WASI-III, he found the following: Axis I – anxiety disorder secondary to mild cerebral palsy; Axis II – borderline intellectual functioning; Axis III – mild cerebral palsy; Axis IV – social isolation; and Axis V – GAF 41 to 50 (R. 1082-83). Dr. VanAtta opined "[i]t would be a disservice to this young man to simply appraise him as being of borderline intellect and to fail to emphasize his strengths within the nonverbal domain." Dr. VanAtta recommended Plaintiff undergo "evaluation by vocational rehabilitation experts" so his employability could be assessed, developed, and cultivated. Dr. VanAtta also recommended Plaintiff undergo psychotherapy to improve his socialization skills. Dr. VanAtta did not find Plaintiff disabled (R. 1084).

On June 30, 1999, Plaintiff was evaluated by Ronald D. Pearse, Ed.D., and the results of that evaluation were communicated to Harold Bailey, Jr., Plaintiff's lawyer. (R. 1021). Dr. Pearse noted Plaintiff's eye contact was appropriate and his verbal responses were good during the evaluation. Plaintiff's mood was depressed and his affect was restricted. No psychotic symptoms were observed. Dr. Pearse opined Plaintiff's insight was fair, judgment was mildly impaired, long-term memory was "weak but intact," attention was mildly impaired, concentration was limited, and abstract reasoning was limited. Plaintiff scored the following on the WAIS-III: Verbal IQ was seventy; Performance IQ was seventy-eight; and Full Scale IQ was seventy-two (R. 1022). Dr. Pearse opined Plaintiff performed in the borderline range of intellectual abilities and that he met Social Security Listing 12.05C, based on Plaintiff's "overall intellectual abilities and secondary impairment, particularly his CP" (R. 1023).

16

In a subsequent letter to Plaintiff's lawyer, dated August 19, 1999, Dr. Pearse wrote he had complied with Mr. Bailey's request and had administered the Wonderlic Personnel Test to Plaintiff. According to Dr. Pearse, the results of that test revealed that Plaintiff "would unlikely learn from a formalized training setting" and "may be capable of using simple tools but would be in the need for consistent supervision." Dr. Pearse opined Plaintiff's "'best fit'" with regard to employment would be "a sheltered workshop setting," but, due to Plaintiff's "lack of social skills," Plaintiff "would likely have difficulty even in that type of setting" (R. 1024).

On August 8, 2001, William Fremouw, Ph.D., completed a Psychological Interview of Plaintiff. Plaintiff's chief complaint was that his Child's Social Security Insurance benefits were terminated when he attained the age of eighteen and he was reapplying for benefits because he had "cerebral palsy, left side paralysis, and learning disability." Dr. Fremouw noted Plaintiff had "no problems with ambulation or posture" and was cooperative and had good social skills. Plaintiff did appear "somewhat immature and awkward" (R. 1101). Dr. Fremouw listed Plaintiff's presenting problems as his still having weakness on his left, which was "improving"; sleeping five hours per night; stable weight; no crying; no suicidal or homicidal ideations; energy level that varied; "generally good" mood; no phobias; no panic attacks; and no PTSD. Dr. Fremouw found Plaintiff's 1996 IQ test, which produced Verbal IQ of seventy-nine, Performance IQ of eighty-four, and Full Scale IQ of eighty, was "consistent with previous IQ tests reported." Dr. Fremouw noted Plaintiff graduated from high school in the spring of 2000, was not involved in extracurricular activities when in school, and had no school-related disciplinary problems. Dr. Fremouw also noted Plaintiff had never had a driver's permit or license (R. 1102).

Plaintiff's mental status examination revealed a normal appearance; a cooperative attitude; slight social immaturity; friendly; adequate speech; oriented times four; self-described mood as "sleepy"; an appropriate affect; logical and coherent thought process; thought content that was absent delusions, obsession, and preoccupations; no hallucinations, delusions, or dissociations; normal judgment; immediate memory within normal limits; recent memory within normal limits; mildly impaired concentration; and no agitation, pacing, or fidgeting. Dr. Fremouw listed the following objective symptoms: history of special education services; IQ tests that place Plaintiff "in the top of the borderline range"; no driver's license; no work experience; and "impairment in adaptive functioning." Dr. Fremouw's diagnostic impression was for Axis I, no diagnosis; Axis II, borderline intellectual functioning; and Axis III, cerebral palsy by self report. Dr. Fremouw found Plaintiff's prognosis to be "good" (R. 1103).

Plaintiff listed his daily activities as rising between 5:00 a.m. and 6:00 a.m., watching television, walking to the store, helping his mother around the house, playing Nintendo, completing yard work, and retiring at 11:00 p.m. Plaintiff did not attend church or belong to any clubs. Plaintiff did not date, but he visited relatives. Dr. Fremouw found Plaintiff's concentration was mildly impaired. Dr. Fremouw opined a finding on Plaintiff's persistence/pace was not applicable (R. 1103). Dr. Fremouw found Plaintiff's immediate, recent, and normal memories were within normal limits and that Plaintiff was competent to manage benefits. Dr. Fremouw also opined Plaintiff would be "an excellent candidate for Placement Institute or other job training assistance programs. He is motivated and has adequate social skills" (R. 1104).

On August 10, 2001, Robert P. Marinelli, a state-agency psychological consultant, completed a Psychiatric Review Technique of Plaintiff. Dr. Marinelli found Plaintiff had non-severe impairments

and organic mental disorders (R. 1106). Specifically, Dr. Marinelli found Plaintiff's organic mental disorder was high-end borderline intellectual functioning (R. 1107). Dr. Marinelli found Plaintiff was mildly limited in his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration, persistence, or pace. Dr. Marinelli found Plaintiff had not experienced episodes of decompensation (R. 1116). Additionally, Dr. Marinelli found the evidence did not establish the presence of the "C" criteria (R. 1117).

On August 16, 2001, Katie Hoover, M.D., conducted a Disability Determination Examination of Plaintiff for the West Virginia Disability Determination Service. Plaintiff's chief complaint was that he was applying for disability due to cerebral palsy, back pain, and learning disability. Plaintiff stated his cerebral palsy caused his right hip to give out, spasms in his leg, trouble writing, and pain in his hands. Plaintiff asserted his back pain was in the form of "constant lumbar pain since he was a child"; difficulty sleeping at night; and difficulty bending, stooping, lifting or prolonged standing. Plaintiff informed Dr. Hoover his learning disability manifested itself in his having "trouble learning," he experienced severe anxiety, he felt "scared all the time," and he had panic attacks (R. 1121). In completing her review of Plaintiff, Dr. Hoover reviewed only the progress notes from the Family Practice Residency Program (R. 1122).

Dr. Hoover noted Plaintiff's only medication was an inhaler as he had been diagnosed with asthma. Dr. Hoover observed Plaintiff's gait was positive for a slight limp on the left (R. 1122). Plaintiff's HEENT, neck, lungs, heart, abdomen, and extremity examinations produced normal results. Dr. Hoover found Plaintiff's back had "slight scoliosis with a curvature to the right in the upper thorax and a compensatory curvature to the left." Dr. Hoover found Plaintiff could walk on his heels but not on his toes. Plaintiff experienced difficulty squatting because of left leg weakness. Plaintiff's grip was

forty-two on the right and thirty-six on the left (R. 1123). Plaintiff's neurologic examination showed his sensation and cranial nerves were intact. Plaintiff's left, lower leg was somewhat weak and his reflexes were "2+ bilaterally" (R. 1124).

Dr. Hoover's assessment was that Plaintiff did "appear to have some weakness and disability from cerebral palsy, as well as back pain." Dr. Hoover noted Plaintiff needed "further evaluation as far as his learning disability goes because this would obviously contribute to any problems he has in learning or working" (R. 1124).

On August 16, 2001, a Ventilatory Function Report Form was completed of Plaintiff. It was positive for "moderate COPD and mild restrictive disease" (R. 1127).

On September 18, 2001, Fulivo R. Franyutti, M.D., a state-agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour work day, and push and/or pull unlimited (R. 1134). Dr. Franyutti found Plaintiff was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and/or crawl (R. 1135). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 1136-37). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and extreme heat, but was not limited in his exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 1137). Plaintiff's RFC was reduced to light by Dr. Franyutti (R. 1138).

On June 19, 2002, Thomas E. Andrews, Ph.D., completed an Adult Mental Profile of Plaintiff for the West Virginia Disability Determination Service. Plaintiff was twenty-two. Dr. Andrews observed Plaintiff's gait and posture were mildly impaired. Dr. Andrews opined Plaintiff's "initial

20

anxiety seemed to block some of his behavior" during the performance testing, but "he improved as time went on" and "had increasing success" with the evaluation (R. 1142). Plaintiff's chief complaints were that he lived with his mother and stepfather and had no source of income; therefore, Plaintiff was applying for disability benefits due to "mild cerebral palsy," "headaches," "back goes out," left side partial paralysis due to cerebral palsy, and depression. Plaintiff listed his presenting symptoms as not sleeping, mood changes, irritability, and low energy. Dr. Andrews did not review any medical records in preparing his report (R. 1143).

Dr. Andrew's mental status examination of Plaintiff revealed the following: 1) Plaintiff was cooperative during testing; 2) he made normal eye contact and his verbal responses were normal; 3) Plaintiff's relevancy, coherency, production, pace, and tone quality of speech were normal; 4) his orientation was normal; 5) his mood was normal and his affect was "broad normal"; 6) Plaintiff's thought process and thought content were normal; 7) Plaintiff's perceptual functioning was normal; 8) his insight was good; 9) Plaintiff's judgment was mildly deficient; 10) his recent and remote memories were normal; 11) Plaintiff's concentration was mildly deficient; and 12) Plaintiff's psychomotor behavior was mildly to moderately impaired. Plaintiff scored the following on the WAIS-III: Verbal IQ was seventy-six; Performance IQ was eighty-seven; and Full Scale IQ was seventy-nine (R. 1144). On the WRAT-II, Plaintiff scored the following: reading and arithmetic were fifth grade and spelling was third grade (R. 1145).

Dr. Andrews made the following diagnoses: Axis I – adjustment disorder, depressed mood, secondary to physical problem; Axis II – borderline intellectual functioning; and Axis III – cerebral palsy by self report. Dr. Andrews opined Plaintiff's prognosis was good (R. 1146).

Plaintiff informed Dr. Andrews that his activities of daily living were rising in the morning, watching television "all day most of the time," "sometimes" eating breakfast, occasionally visiting "aunt and a couple of people," getting ready for bed, lying down for a few hours, and listening to the radio all night. Plaintiff reported he groomed himself once daily, cleaned once a week, walked twice a week, watched television "all day long," listened to the radio daily, visited others three times per week, and worked on his hobbies once per week (R. 1146).

Plaintiff described his social functioning as normal; however, he stated he "hate[ed] crowds." Plaintiff reported the following social activities: ate out in restaurants twice a week; visited with friends and/or relatives three times per week; and talked with neighbors once daily. Dr. Andrews found Plaintiff's social functioning was normal (R. 1146).

Dr. Andrews found Plaintiff's concentration was mildly deficient, his persistence was within normal limits, his pace was within normal limits, his immediate memory was normal, his recent memory was within normal limits, his remote memory was within normal limits, and he would be able to manage benefits (R. 1146-47).

At the administrative hearing on October 1, 2002, Plaintiff testified he was treated by Dr. Hill for allergies, back pains, and headaches (R. 95-96). He stated he was not under the care of a psychiatrist or psychologist (R. 96). He testified he could sit for one to one-and-a-half hours before he had to move around and could stand for about fifteen to twenty minutes (R. 100). Plaintiff stated his doctor instructed him to exercise more so his muscles could "handle more." Plaintiff testified he experienced "a little" left side paralysis because of cerebral palsy (R. 101). Plaintiff stated it took him longer to do things with his left hand than it did to do things with his right hand (R. 102). Plaintiff testified he had difficulty sleeping in that he went to bed at 11:00 p.m., had difficulty falling asleep and

staying asleep, and rose at 8:30 a.m. or 9:00 a.m. (R. 102-03). Plaintiff stated he did not "help around the house" (R. 104). Plaintiff stated that on "some days [his] back would hurt . . ." and he would not be able to do any chores; however, he testified he could pick up clothes from his bedroom floor. Plaintiff asserted he did not vacuum, dust furniture, clean the bathroom, or do laundry (R. 105). Plaintiff stated he watched television "mostly all day," two hours of which were spent lying down and watching (R. 106-07). Plaintiff stated he spoke to people on the telephone once or twice per week, but he did not visit people and people did not visit him (R. 107). Plaintiff testified he traveled in a car with his mother and stepfather once or twice per week to visit their friends. Plaintiff asserted he did not indulge in any hobbies, did not attend church, did not belong to any clubs, and did not drive (R. 108). Plaintiff stated he did not pursue obtaining a driver's license because he had difficulty learning the "controls" of a car (R. 109). Plaintiff testified he found it problematic to steer a car and push the gas or the brake (R. 118). Plaintiff testified he played "racing games" on a "[P]lay [S]tation" (R. 116)

Plaintiff stated he had "100 percent" control and use of his right side, but less control/use of his left side due to cerebral palsy. Plaintiff testified he had difficulty learning (R. 111). Plaintiff testified he could not get a job because he was "afraid [he] would be a threat to people," he did not "adapt to people too well," and he was not "forward to talk to people" whom he did not know (R. 119). Plaintiff stated he was concerned that people "would count on [him] to . . . brace them . . ." and he "would lose control . . . lose strength or something, and wouldn't be able to, which then would cause them to get hurt" (R. 120). Plaintiff testified that he could perform a job that did not require him to lift more than he could lift, carry more than he could carry, or do more than he could physically do. Plaintiff testified he could "try" to perform a job that allowed him to sit and move around as he needed and called for repetitive actions (R. 121).

23

James D. Griffith, Plaintiff's stepfather, testified at the administrative hearing that Plaintiff could not maintain a job because he was "too backward, he can't get around people. He's afraid of crowds." Mr. Griffith asserted Plaintiff could not concentrate (R. 123). Mr. Griffith stated Plaintiff did not do his chores the right way. Mr. Griffith testified he did not know if Plaintiff could do laundry because he had never done it (R. 124). Mr. Griffith stated Plaintiff was capable of choosing his clothes and dressing himself. According to Mr. Griffith, Plaintiff visited a friend at her house (R. 127). Mr. Griffith testified Plaintiff got "away" from the house "a good bit" in that he walked "uptown" to the "library and sit around . . . the computer" (R. 128).

At the administrative hearing, the ALJ asked the following series of hypothetical questions of the VE:

ALJ: I want you to assume a person who could do light work with a sit/stand option, requiring that he be seated at least five minutes after every hour. Sorry, five minutes in every hour. He should have no exposure to pulmonary irritants, such as fumes, gases, dust, noxious odors, or a situation in which there's poor ventilation. His work should be low stressed [sic] work, and by that I mean unskilled work, requiring one to two step instructions with routine and repetitive processes, dealing primarily with things rather than people. The work should have no high production quotas, and no more than minimum interaction with co-workers should be required. And the job should not require reading above the fifth grade level. Are there jobs that this person could perform?

VE: Yes, Your Honor. . . . [T]here are numbers of laborer jobs that I believe can be performed for an individual with the restrictions as indicated in this hypothetical. And in the State of West Virginia there would be 1,251 jobs classified as light that would be under the category of laborer according to the SOC code that is used in identifying the jobs. . . . In the national economy there would be 622,519 jobs classified as light under the laborer category. I believe that some of the jobs would not be appropriate, and so I think there would be like a percentage of the jobs, perhaps 40 percent of those jobs would be appropriate and would fit within this hypothetical. . . .
[T]here would be packer jobs . . . [a]nd there would be 141 jobs in the local regional economy, and there would be 215,300 jobs classified as light in this category in the national economy. . . .
There would be the work of a security guard. And similarly not every light security guard job would be appropriate for this hypothetical individual. But there would be

24

perhaps 50 percent of the jobs that would fit within this hypothetical. . . . According to the statistics there are 38 light security guard jobs in the State of West Virginia, and that would be 20 percent of all light security jobs in the State of West Virginia. . . . So in my view there would be perhaps 50 percent of those jobs would fit within this classification. . . . 19. And similarly in the national economy, there would be 5,460 jobs classified as light as a security guard, and perhaps 50 percent of those jobs would be available for an individual within this hypothetical. . . .

ALJ: I want you to assume the same set of limitations, and the same person, same age, same educational and vocational profile. This person could do sedentary work, are there different jobs that this person could perform, or other jobs?

VE: There would be according to the statistics I used, jobs in the same category as laborer, as packer and as security guard, that would be classified as – well excuse me. Based on the information I used as far as jobs that would be able to be performed by individuals with limited education. I also want to say that the numbers I've used takes that into account, even in the first hypothetical. . . . So when looking at the statistics, as far as limited education there are no security guard jobs for an individual with a limited education that would be classified as sedentary. . . . However, in terms of the work of packer, there are sedentary jobs in the local regional economy there are five jobs. . . . However, they are classified as sedentary in the local regional economy, and 7,557 jobs classified as sedentary in the national economy. Again I believe that not all of those jobs would be within the hypothetical. Similarly, the laborer jobs that I identified. . . . I mean I would say it would be similar as I indicated before, 50 percent. So they're virtually no jobs as a packer, I mean 50 percent of . . . two or three jobs in the whole region.

ALJ: . . . In the light category, you reduced the number of laborer jobs by 40 percent, and the number of security guard jobs by 50 percent. But you didn't reduce the number of packer jobs, did you intend to?

VE: Yes, that would be . . . 50 percent.

ALJ: And the same at the sedentary?

VE: Yes.

ALJ: Now you said that there were laborer jobs at the sedentary level, but you didn't give me any numbers.

VE: Yes, the actual number, that would be 20 percent of all unskilled jobs, categorized as a laborer job according to SOC code.

ALJ: And do you know how many that is?

VE: There [sic] 133. . . . And I would say that perhaps 40 percent of those jobs would be available for this hypothetical individual.

ALJ: How many at the national level?

VE: There . . . are 66,225 listed for a person with a limited education as sedentary, as a laborer. So I would say 40 percent of that number, which would be I think roughly, 28,000 or 30,000.

ALJ: Are there other jobs at the sedentary level besides the – not otherwise classified laborer jobs and the packer job?

VE: There would be assembler jobs. And in the local regional economy there are identified 62 jobs that are available, and that are classified as sedentary. In my view there would be 50 percent of those would fit within this hypothetical. . . . And in the national economy there are listed 103,800 jobs, and in my view 50 percent of those jobs would fit within the hypothetical.

ALJ: . . . [I]f you imposed the limitation on this person that his left hand, the non-dominant hand, that there's limited use of the left hand primarily to assist right-handed activities. How would that affect the availability of these jobs?

VE: [I]t would be my opinion that laborer jobs, even the reduced numbers would require bilateral use and dexterous use of both hands in general.

ALJ: So it's going to eliminate all the jobs?

VE: So I believe it would even eliminate the [laborer] jobs. . . . The packer work, I don't believe it would eliminate even the reduced numbers of jobs, because I think it can be done at your own pace and doesn't require extreme dexterous use and strength, even in the jobs that are light particularly. . . . So I don't believe it would rule that out. Security guard work that would not affect it. . . . [T]he assembler, I don't believe it would adversely affect it at a sedentary level, I think that could be accommodated. That limitation could be accommodated in a sedentary assembly job.

ALJ: If this person had to be off task more than one hour a day, due to pain, or lapses in concentration, or any other symptom that could be reasonably connected to his physical and mental impairments. How would that affect the availability of these jobs?

VE: Even unskilled jobs where the productivity requirements sometimes are not as strict, I believe if an individual were off task one hour per day, that there would be no jobs.

ALJ: Assuming that I find all of Mr. Allen's testimony to be credible, and that all of his impairments are supported by medical evidence, would there be any jobs that he could do?

VE: No, Your Honor (R. 134-42). . . . .

COUNSEL: Dr. Ostrowski, why would there not be any jobs if his testimony was credible?

VE: Well, in his difficulty with seemingly learning from past experience, I believe it would be the most important factor. I think even in unskilled jobs that require a brief demonstration, that individual has to learn how to do it properly, and do it over and over again. And it appears that from his testimony, supplemented by his stepfather, that he has difficulty doing that. . . . .

COUNSEL: With unskilled jobs, when you show up at work are you expected to be able to attend to your personal needs, for instance, show up on time, go to the bathroom when you're supposed to, come back to work, leave when you're supposed to? . . . .

VE: I think you're initial question was, are even people working in unskilled jobs required to meet certain standards of attendance and productivity, and the quorum and ability to get along? Yes, they are.

COUNSEL: [C]an you give me any idea about what percentage of time a person has to be on task, doing what they're supposed to be doing, producing product work versus off task? Is there an amount of time that it's acceptable for them to be off task?

VE: In my experience is an individual has to be on task 85 percent of the time . . . Or else they'd have difficulty meeting the standards.

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Gibbs made the following findings:

1. The claimant meets the non-disability requirements for Child's Insurance Benefits (Disability) set forth in Section 202(d) of the Social Security Act (with the exceptions noted in 20 CFR § 404.352(b)(2)).

2. The claimant has not engaged in substantial gainful activity since August 26, 1997.

3. Since August 26, 2997, the claimant has had cerebral palsy, chronic obstructive pulmonary disease, borderline intellectual functioning, and adjustment disorder with

depressed mood, impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. Since August 6, 1997, the claimant has had the following residual functional capacity: he is able to perform the demands of light work with certain modifications. He must be allowed to sit or stand at will during the workday and be allowed to sit at least five minutes in each hour. He is unable to perform jobs requiring exposure to pulmonary, such as fumes, dust, gases, noxious odors, or poor ventilation. He is unable to perform jobs requiring use of the non-dominant hand for more than assisting dominant-hand activities. He is limited to low stress work. Low stress work is defined as unskilled work that involves one- to two-step instructions; routine, repetitive processes that do not require high production quotas; working with things rather than people; and minimal interaction with coworkers.

8. The claimant has no past relevant work (20 CFR §§ 404.1565 and 416.965).

9. Since August 26, 1997, the claimant has been a "younger individual" (20 CFR §§ 404.1563 and 416.963).

10. The claimant is functioning at the "marginal education" level (20 CFR §§ 404.1564 and 416.964).

11. Since August 26, 1997, the claimant has had the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

12. Although the claimant's limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as packer, security guard, and assembler.

13. The claimant has not been under a "disability," as defined in the Social Security Act, at any time since August 26, 1997 (20 CFR §§ 404.1520(f) and 416.920(f).

(R. 47-48).

# IV. DISCUSSION

## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred by failing to follow the directives set forth in the Appeals Council Remand Order.

2. The ALJ erred by failing to properly consider the evidence in making her findings regarding the Listing "B" and "C" Criteria.

3. The ALJ erred by rejecting the medical source opinions in favor of an RFC finding that fails to include all of Plaintiff's mental limitations.

The Commissioner contends:

1. The Administrative Law Judge fully complied with the Appeals Council's Remand Order.

2. The ALJ properly evaluated the evidence in finding that Plaintiff did not satisfy the Part "B" or "C" Criteria under the relevant listings for mental impairments.

3. The Administrative Law Judge included all of the mental limitations that were supported by the record in the RFC assessment which she incorporated in the hypothetical question posed to the vocational expert.

## C. Appeals Council

Plaintiff first argues the ALJ erred by failing to follow the directives set forth in the Appeals Council Remand Order. Defendant contends the Administrative Law Judge fully complied with the Appeals Council's Remand Order.

On November 3, 2001, the Appeals Council granted Plaintiff's request for review of the original hearing decision, vacated that hearing decision, and remanded the case to an Administrative law Judge for further proceedings (R. 1036). The Order remanding the case provided, in pertinent part:

> The hearing decision finds the claimant has mental and physical impairments of cerebral palsy, borderline intellectual functioning, attention deficit disorder, and chronic obstructive pulmonary disease similar to asthma, impairments that are severe but do not meet or equal the criteria of any listing. Evidence shows however that the claimant's verbal IQ score on June 30, 1999 was 70. (Exhibit B12F). The decision gives little weight to this report of testing, finding that since previous scores were significantly higher it is reasonable to treat the claimant as having the higher scores. Dr. Pearse indicates that the claimant would have difficulty even in a sheltered workshop setting. (Exhibit B13F). The decision gives little weight to his opinion by stating that the Wonderlic Personnel Test does not measure the ability to do a job or learn tasks.

> Consultative examination on August 25, 1997 notes that the claimant has trouble speaking and forgets what he is talking about. (Exhibit B5F). Psychological evaluation on September 25, 1997 shows the claimant's concentration was impaired. (Exhibit B7F). Reports by several teachers indicate substantially different functional limitations. (B3E to B10E). Dr. Pearse's opinion should be further evaluated and inconsistencies in IQ testing resolved. Also the differences in teacher assessments

should be resolved. The claimant has a combination of mental and physical impairments with the potential to meet or equal Listing 12.05C or Listing 11.07 or limit the claimant further than that found in the decision.

Upon remand, the Administrative Law Judge **will**:

- Give consideration to the examining source opinion, pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating and examining sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments (20 CFR 404.1512 and 416.912). The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources.

- Obtain additional evidence concerning the claimant's mental impairments in order to complete the administrative record in accordance with regulatory standards concerning consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913). The additional evidence may include, if warranted and available, a consultative psychiatric examination with psychological testing and medical source statements about what the claimant can still do despite the impairments.

- Further evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520a and 416.920a and document application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Rulings 85-16 and 96-8p).

- Further, if necessary, obtain evidence from a medical expert to clarify whether the claimant's impairments meet or equal the severity of an impairment listed in Appendix 1, Subpart P., Regulations No. 4 (20 CFR 404.1527(f) and 416.927)(f) and Social Security Ruling 96-6p).

. . . .

(Emphasis added). The undersigned finds the second ALJ's decision does not comply with this Order.

The Appeals Council clearly directed the ALJ to give consideration to and explain the weight given

Dr. Pearse's opinion. The Appeals Council expressly noted its concern about the inconsistencies in the IQ's, Dr. Pearse's opinion that Plaintiff would have difficulty working even in a sheltered workshop, and the "differences in the teacher assessments."

A review of the ALJ's decision, however, does not indicate what weight, if any, she accorded Dr. Pearse's opinion. Not only is this contrary to the Order, but also to Fourth Circuit law. In Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984), the Fourth Circuit stated:

> We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. See, e.g., Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980); Stawls v. Califano, 596 F.2d 1209, 1213 (4th Cir. 1979); Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977). As we said in Arnold: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

Although not expressed as required, it appears to the undersigned that the ALJ accorded Dr. Pearse's opinion little to no weight whatsoever. The ALJ reasoned that Dr. Pearse based his validity assessment on "historical information" but "did not specify which school intellectual assessments he had reviewed prior to rendering his opinion" and "the testing at the time of the [school] evaluations revealed I.Q. scores in the low average to average range." The ALJ further noted that "the latest [2002] WAIS-III testing resulted in scores well above those reported by Dr. Pearse." These, however, are exactly the reasons given in the previous ALJ decision that the Appeals Council found insufficient: "The decision gives little weight to this report of testing, finding that since previous scores were

significantly, higher, it is reasonable to treat the claimant as having the higher scores." (Emphasis added).

The only other reason the ALJ gives for dismissing Dr. Pearse's opinion is that, "in contrast to the detailed validity analysis reported by the consultative evaluator when commenting on the validity of the claimant's I.Q. scores, Dr. Pearse failed to comment on the claimant's cooperation, or effort, or motivation during the testing."

The undersigned finds the ALJ has not resolved "the inconsistencies in IQ testing. Further, the scores before 1996, are not considered totally reliable by the Administration. See Pt. 404, Subpart P, App. 1, Listing 112..00D10, which provides:

> Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current . . . For 2 years . . . . IQ test results obtained before age 7 are current for . . . 1 year . . . .

Therefore, none of the prior to 1996 are valid to indicate Plaintiff's "current" status. Additionally, the Regulations require the use of the lowest score where multiple scores are obtained from one test– e.g., verbal, performance, and full scale while "identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning." Although the tests used by the various examiners are all approved tests, the undersigned believes part of "reconciling" the various scores should include consideration of the different tests involved.

Significantly, the Listing requires only "A valid verbal, performance, or full scale IQ of 60 through 70 . . . ." (Emphasis added). Here, Plaintiff has a verbal score of 70, which the examiner found was valid. The Fourth Circuit has not addressed the issue of which score should be used where there are multiple tests.

For all the above reasons, the undersigned finds the ALJ did not follow the Appeals Council's directions in resolving the "inconsistencies in IQ testing."

Further, although the Appeals Council expressly noted Dr. Pearse's opinion that Plaintiff might not even be able to work in a sheltered workshop, the ALJ failed to discuss the Wonderlic Personnel Test. The ALJ compared Dr. Pearse's opinion regarding Plaintiff's ability to perform competitive work to Dr. Van Atta's. First, however, the undersigned does not find the opinions as different as they may appear. Dr. Pearse and Dr. VanAtta are both examining psychiatrists. Dr. Van Atta noted there was a marked statistically and clinically significant difference between Plaintiff's verbal and performance IQ scores, and found Plaintiff's comprehension subtest result (which he interpreted as a measure of social intelligence) was "grossly deficient." He diagnosed Plaintiff with Anxiety Disorder Secondary to Mild Cerebral Palsy, Borderline Intellectual Functioning, Social Isolation, and a GAF of 41-50.[1] The ALJ, however, quotes only Dr. Van Atta's "Recommendation" that "[i]t would b e a disservice to this young man to simply appraise him as being of borderline intellect and to fail to emphasize his strengths within the nonverbal domain" and his recommendation that Plaintiff be evaluated by vocational experts "rather than determining him to be disabled at this point in his development."

Dr. Pearse evaluated Plaintiff nearly a year after Dr. Van Atta. He found Plaintiff met 12.05C based on his borderline intellectual functioning <u>as well as</u> his "limited coping skills." In other words, Dr. Pearse did not find Plaintiff met 12.05C based on IQ score alone. Dr. Pearse's opinion would be

---

[1]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM-IV</u>"), 32 (4th ed. 1994). (Emphasis in original).

better expressed as finding Plaintiff "equaled" the listing, rather than meeting it.   Dr. Pearse also gave Plaintiff the Wonderlic Test, which the ALJ failed to discuss.  The undersigned therefore has no way of knowing the weight accorded this test, if any.  The undersigned also does not know the weight that should be accorded this test.  Dr. Pearse stated that the test is "a short form test of cognitive ability [that] describes the level at which an individual learns, understands instructions, and problem solves." He noted that a raw score of 12 was "considered to be the minimum score for an individual to work in an unskilled position with little supervision."  Plaintiff obtained a raw score of 9.  Dr. Pearse opined that this placed him below the 1st percentile in regard to the adult working population, and indicated that Plaintiff "would unlikely learn from a formalized training setting; would be in need of consistent supervision; and would have significant difficulty utilizing contingencies should an emergency arise in a work setting."   It is in this context that Dr. Pearse opined Plaintiff's "best fit" in regard to employment was in a sheltered workshop.  He then added that, "given his lack of social skills he would likely have difficulty even in that type of setting."

The ALJ failed to discuss the Wonderlic test, which was in large part the basis for Dr. Pearse's opinion regarding Plaintiff's ability to perform work.  The ALJ also did not discuss Dr. Pearse's opinion regarding Plaintiff's need for supervision, difficulty learning, and significant difficulty dealing with emergencies.

Other evidence in the record supports Dr. Pearse's opinion.  The 1996 IQ test, given by Dr. Roman,  indicated Plaintiff's lowest score in the Verbal area was for "retention of information over time" at which he scored  at the 2nd percentile.  He also had "a very low score" in "freedom from distractability" based on auditory math reasoning and digit span "where he had much difficulty repeating numbers forwards and backwards."  Dr. Roman recommended exploring whether Plaintiff

would be eligible to transfer from his special education class to United Technical Center "to try to see what can be done to lean in that direction." He opined, "The typical classroom setting is not conducive and it appears that he is not going to meet success. He already is lacking in his confidence and it appears that he gave up on the school as well as the school giving up on him. . . . He will probably be lost if he has to maintain a traditional classroom setting . . . . Finally, as can be seen from his grades that are enclosed we see that he had all "F's" with the exception of physical education. Therefore, this is even more pertinent as to how close he is to dropping out of school and he remains a high risk. Therefore, he will be made a priority to look for an alternative school setting."

The undersigned therefore finds the ALJ did not "[g]ive consideration to [Dr. Pearse's] opinion . . . and explain the weight given to such opinion evidence" as Ordered by the Appeals Council.

Nor does the undersigned finds the ALJ resolved "the differences in teacher assessments" as the Appeals Council directed. In 1997, Plaintiff's English Teacher noted that Plaintiff was not even at grade level in the special education setting. He could not stay on task and sometimes wandered around the classroom. He was not keeping up with the class pace, and needed special attention. He did not complete assignments without constant encouragement. He did not relate to and was not on the same maturity level as his peers. He comprehended but appeared not to remember spoken instructions. He did not appear to have any reciprocal friendships, and was usually alone during breaks and lunch, although he did relate to the teacher "on a limited level." He was mannerly and cooperative, but did not follow through with instructions, needing on-on-one attention, even in the small, structured special education class.

Plaintiff's science teacher wrote that same year that she worked with plaintiff on a one-to-one basis. There he worked to his potential as a Learning Disabled student. He kept up with the class

pace, "but the entire class is being remediated." He could not relate what was presented to written evaluation and had difficulty comprehending oral and written work. He completed only part of his assignments. He had good keyboarding skills and enjoyed computer assisted instruction, but could not complete assignments without assistance. He had poor communication skills and difficulty trying to formulate questions. He related well to her and had "adequate interaction with other students, but is a 'loner.'" He was occasionally distracted by other students and needed help staying on task. He stayed on task if the assignment was computer generated. She finally wrote that Plaintiff had very low self esteem and appeared backwards in social interactions. He was a loner who ate lunch by himself if he ate at all. He was very likeable, but immature for his age.

Plaintiff's math teacher that same year wrote that Plaintiff was in a lower-level class with only five other students. He was "slower" but did get the concept "after lots of practice." He stayed on task, but still did not complete all his work in a given time. He needed to be encouraged to keep up. He always finished his work, just not in the time provided. He was "very weak" in communication skills. He spoke slowly and precisely to her, but "with his peers, he hesitates or doesn't respond. He is a loner in the mornings and lunchtime." He had no friends that he related to and stayed very quiet and to himself. He sometimes "drift[ed] off." He was "easily distracted. "Some days he [was] disoriented mentally as far as staying on task."

Another teacher wrote that Plaintiff was in a class of six students, and accomplished only about 50% of what his classmates did. He spelled on the 2nd-3rd grade level and read on the 3-4th grade level. He enjoyed high interest books on his level. He tried hard but worried constantly and needed support and encouragement about every ten minutes. He had improved socially, "but still ha[d] a long way to go." Nine months earlier he would not even try to talk or socialize, but now he did try,

speaking softly in short, choppy sentences. Where asked how Plaintiff related to the teacher, if he related appropriately with other children, and if he had reciprocal friendships, the teacher wrote only: "He relates well and wants to spend additional free time with me." He tried hard and his only behavioral problem was "craving attention." He became distracted "very easily."

Yet another teacher wrote that Plaintiff was mainstreamed in her history class, where he was not working at grade level. He had a hard time keeping up and did not read on level. He completed assignments most of the time but needed more cuing to complete the work. He related to the teacher fine and "peer relationships" were "somewhat" reciprocal. He was cooperative and had no specific problems with attention, concentration or distractability.

One other teacher wrote that Plaintiff was in a remediation class with ten other students and a computer applications class with five other students. He was working at grade level in this remediation class, and stayed on task, "but ha[d] difficulty comprehending subject material." He kept on task in his LD classes, but had difficulty with cognitive areas. He completed assignments with positive reinforcement. He appeared to have difficulty expressing himself – not a speech abnormality, but difficulty with identifying and articulating what he wanted to say. He had a good relationship with the teacher and fellow students during class, but appeared to be "very timid, at time[s] withdrawn." He ate lunch alone and lacked mature social skills. He stayed on task with no attention problems. His difficulty was "in understanding material presented."

The undersigned disagrees with the ALJ that the above reports "establish[ed] that the claimant related adequately to teachers and classmates [but] chose to be a 'loner' while in school [and] establish[ed] that the claimant was able to keep up with the pace in most of his special education classes, but that he had to be encouraged to complete assignments in a timely manner."

The undersigned finds the ALJ did not follow the Appeals Council's direction in "resolving" the teachers' reports and also finds substantial evidence does not support her conclusions regarding the teachers' reports.

The undersigned does not find the ALJ erred by not obtaining a Medical Expert ("ME"), however, although it would have been helpful in reconciling the IQ scores. As Defendant argues, the Appeals Council did not order the ALJ to retain an ME, but directed the ALJ to obtain evidence from a medical expert to clarify whether the claimant's impairments meet or equal a listing, "if necessary." The undersigned therefore finds the Appeals Council left this up to the ALJ's discretion. Nor do the Regulations require the ALJ to obtain a medical expert. See 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii).

## D. Listings "B" and "C"

Plaintiff next argues the ALJ erred by failing to properly consider the evidence in making her findings regarding the Listing "B" and "C" Criteria. Defendant contends the ALJ properly evaluated the evidence in finding that Plaintiff did not satisfy the Part "B" or "C" criteria under the relevant listings for mental impairments.

The ALJ found Plaintiff had the severe impairments of cerebral palsy, borderline intellectual functioning, and an adjustment disorder with depressed mood. The ALJ then determined that none of Plaintiff's impairments, considered singly or in combination, met or equaled any listing. The undersigned has already found that the ALJ erred in considering and reconciling Plaintiff's various IQ scores and therefore finds that substantial evidence does not support the ALJ's finding that Plaintiff does not meet or equal Listings 12.05C or 11.07.

Further, the undersigned finds substantial evidence does not support the ALJ's findings under the "B" criteria of the psychological listings. As the ALJ herself states:

> The first area of the "B" criteria, "activities of daily living," includes adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office.

A review of the record indicates Plaintiff did almost none of these things. This does not mean he could not do them, only that there is no evidence to support the ALJ's finding that he had only a "mild" limitation in this area. The ALJ supported her finding, stating:

> At the time of the consultative examination on September 25, 1997, the claimant's activities included attending school. He reported that after school he ate dinner and watched television (Exhibit B-7F).[2] The claimant reported to Dr. Fremouw at the time of the consultative evaluation on August 8, 2001 that he spent much of his time watching television or playing Nintendo. He reported that he walked to the store, helped his mother around the house, and did the yard work for his mother (Exhibit B-17F). He reported similar activities at the time of the consultative evaluation on June 19, 2002 (Exhibit B-21F).[3] The claimant testified that some days he is not physically able to do his chores.

The undersigned finds this evidence does not support the ALJ's finding that Plaintiff had only a "mild" impairment in the area of "activities of daily living." Significantly, in 1997 (at age 18)

---

[2]The "Daily Activities" portion of the 1997 report actually states only:
The claimant reports he will watch TV and he generally does not sit at the dinner table but is usually "piecing." The claimant's mother states she prepares an evening meal but "Ron just picks." The claimant reports he goes to bed between 9:00 and 10:00 p.m. He reports no activities with friends outside of school. The mother reports "he's a shy kid, he hangs to himself. He's not much for groups."

[3]The "Daily Activities" portion of the 2002 report actually states:
I get up and I watch TV. Sometimes I eat breakfast and sometimes I don't. I just sit and watch TV all day most of the time. Sometimes I go visit my aunt and a couple of people. I watch TV in the evening then I get ready for bed. Sometimes I just lay back down for a few hours. I listen to the radio all night long.

Plaintiff was referred to United Summit Center due to academic problems due to attention deficit disorder and learning disabilities, socialization problems, and "to assist him in daily living skills." He had a Community Support Worker "for transportation and supplementation of services." He received one-on-one basic living skills training for purchasing clothing.

Psychologist Yost found that the evidence indicated that Plaintiff (at age 18) might not be competent to manage his finances if provided with an allowance. In 2002, Dr. Andrews found Plaintiff's personal hygiene (at age 22) was "marginally clean." At the time of the hearing, Plaintiff was a 23-year-old man who had never learned to drive a car and rarely left his mother's house. He did not prepare meals, clean his room, do laundry, do chores, go shopping, or go out with friends, and his only reported hobby was watching television. Plaintiff's stepfather testified Plaintiff had never washed clothes, and he did not think Plaintiff knew how. He testified that Plaintiff dressed sloppily and didn't seem to care. The people from United Summit Center came to the house to teach Plaintiff basic living skills. The stepfather testified that as long as they were there telling Plaintiff what to do he would do it. But after awhile he relapsed, "like he went off . . . in a world of his own, when none of it mattered."

Whether this lack of daily activities is due to a mental disorder or lack of motivation, the undersigned finds it does not support a finding that Plaintiff had only a "mild" restriction of daily activities.

Similarly, the undersigned finds the evidence does not support the ALJ's finding that Plaintiff had only a "moderate" impairment of social functioning. Plaintiffs' teachers for the most part found Plaintiff to be a "loner." His English teacher said he did not relate to his peers, was not on the same maturity level as his peers, and did not appear to have any reciprocal friendships. He was usually alone

during breaks and lunch, although he did relate to her "on a limited level." His Science teacher stated that Plaintiff had very low self esteem and appeared backwards in social interactions. He was a loner who ate lunch by himself if he ate at all. He was very likeable, but immature for his age. His Math teacher stated Plaintiff spoke slowly and precisely to her, but "with his peers, he hesitates or doesn't respond. He is a loner in the mornings and lunchtime." He had no friends that he related to and stayed very quiet and to himself. Plaintiff's LD teacher wrote that he had improved socially, "but still ha[d] a long way to go." Another teacher stated that Plaintiff appeared to have difficulty expressing himself – not a speech abnormality, but difficulty with identifying and articulating what he wanted to say. He had a good relationship with the teacher and fellow students during class, but appeared to be "very timid, at time[s] withdrawn." He ate lunch alone and lacked mature social skills. Finally, one teacher stated that Plaintiff's "peer relationships" were "somewhat" reciprocal. These statements do not support the ALJ's finding: "the claimant's teachers reported that the claimant . . . related adequately to teachers and classmates [but] chose to be a loner while in school."

Plaintiff was referred to United Summit Center in part due to "socialization problems with peers and family." In 1997, psychologist Yost found Plaintiff was "somewhat socially isolated." Dr. Fremouw found in 2001 that Plaintiff, nearly age 22, had good social functioning during the evaluation, but also that Plaintiff did not go to church or any clubs, did not date, and "saw relatives, such as his sister." A year later Plaintiff reported to Dr. Andrews that he ate out in restaurants twice a week, visited with friends and/or relatives three times a week, and talked with neighbors once a day. According to his and his stepfather's testimony, the "restaurants" were mostly "Burger King," where he went with his parents, and the "friends and relatives" he visited were apparently people his parents knew and went to visit. Plaintiff just went along with them. Plaintiff's stepfather testified Plaintiff

liked to "go uptown," but explained that meant he drove Plaintiff to the library where Plaintiff "sits on the computer" and then picked him back up and drove him home. He testified Plaintiff did recently start visiting a girl he knew from school about once every two weeks.

The undersigned does not find the evidence substantially supports the ALJ's determination that Plaintiff had only a "moderate" restriction of social functioning.

Regarding "concentration, persistence, and pace," again the ALJ referred to Plaintiff's teachers' reports in finding Plaintiff was "moderately" limited. Plaintiff's English Teacher noted that Plaintiff was not even at grade level in the special education setting. He could not stay on task and sometimes wandered around the classroom. He was not keeping up with the class pace, and needed special attention. He did not complete assignments without constant encouragement. He comprehended but appeared not to remember spoken instructions. He did not follow through with instructions, needing on-on-one attention, even in the small, structured special education class.

Plaintiff's science teacher wrote that same year that she worked with plaintiff on a one-to-one basis. There he worked to his potential as a Learning Disabled student. He kept up with the class pace, "but the entire class is being remediated." He could not relate what was presented to written evaluation and had difficulty comprehending oral and written work. He completed only part of his assignments. He had good keyboarding skills and enjoyed computer assisted instruction, but could not complete assignments without assistance. He was occasionally distracted by other students and needed help staying on task.

Plaintiff's Math teacher wrote that Plaintiff was in a lower-level class with only five other students. He was "slower" but did get the concept "after lots of practice." He stayed on task, but still did not complete all his work in a given time. He needed to be encouraged to keep up. He always

finished his work, just not in the time provided. He sometimes "drift[ed] off." He was "easily distracted. "Some days he [was] disoriented mentally as far as staying on task."

Another teacher wrote that Plaintiff was in a class of six students, and accomplished only about 50% of what his classmates did. He spelled on the 2nd-3rd grade level and read on the 3-4th grade level. He enjoyed high interest books "on his level." He tried hard but worried constantly and needed support and encouragement about every ten minutes. He became distracted "very easily."

Yet another teacher wrote that Plaintiff was mainstreamed in her history class, where he was not working at grade level. He had a hard time keeping up and did not read on level. He completed assignments most of the time but needed more cuing to complete the work. He was cooperative and had no specific problems with attention, concentration or distractability.

One other teacher wrote that Plaintiff was in a remediation class with ten other students and a computer applications class with five other students. He was working at grade level in this remediation class, and stayed on task, "but ha[d] difficulty comprehending subject material." He kept on task in his LD classes, but had difficulty with cognitive areas. He completed assignments with positive reinforcement.

The ALJ found: "the reports from the claimant's teachers establish that the claimant was able to keep up with the pace in most of his special education classes, but that he had to be encouraged to complete assignments in a timely manner." The undersigned finds the reports do not support this statement.

On the other hand, psychologist Yost found that Plaintiff's concentration was "somewhat impaired;" Dr. Pearse found Plaintiff's concentration was "limited;" and Dr. Fremouw and Dr.

Andrews both found Plaintiff had only a mild impairment of concentration. As the Fourth Circuit

stated in Hays v. Sullivan, 907 F.2d 1453 (4th Cir. 1990):

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979) ("This Court does not find facts or try the case *de novo* when reviewing disability determinations."); *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976) ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); *Blalock v. Richardson*, 483 F.2d at 775 ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.' ").

The undersigned finds there were conflicts in the evidence regarding Plaintiff's limitations of

concentration, persistence, and pace. It is the ALJ's duty, not the court's, to reconcile these

inconsistencies. However, because the teacher reports fail to support the ALJ's interpretation of them,

and because the ALJ failed to consider Dr. Pearse's evaluation as the Appeals Council ordered, the

undersigned cannot find substantial evidence supports her determination that Plaintiff had only

"moderate" limitations of concentration, persistence or pace.

The undersigned does find, however, that substantial evidence supports the ALJ's

determination that Plaintiff did not meet the "C" criteria of the mental listings. As the ALJ found,

there is no evidence in the record that Plaintiff experienced repeated episodes of decompensation, each

of extended duration, or a residual disease process that resulted in such marginal adjustment that even

a minimal increase in mental demands or change in the environment would be predicted to cause

Plaintiff to decompensate. Plaintiff, however, argues that he meets the third criterion, which provides

he must have a: "current history of 1 or more years' inability to function outside a highly supportive

living arrangement, with an indication of continued need for such an arrangement."

Plaintiff argues he has spent his entire lifetime in highly supportive living environment, whether it be his very intimate special education classes, the on-on-one behavioral management classes, or "the nurturing environment of his mother's home." First, however, no non-examining, examining or treating psychologist ever opined that Plaintiff needed to live in a "highly structured environment." Second, Plaintiff did manage to attend school, even though in small, special education classes. The undersigned does not believe the Regulations contemplated public school special education classes when discussing "highly supportive living environments." Further, although Plaintiff did not leave his home, there is no evidence that he was "never able to do so," as he argues.

The undersigned therefore finds substantial evidence supports the ALJ's finding that Plaintiff did not meet the "C" criteria of Listing 12.04.

## E. Medical Source Opinions

Plaintiff finally argues the ALJ erred by rejecting the medical source opinions in favor of an RFC finding that fails to include all of Plaintiff's mental limitations. Defendant contends the Administrative Law Judge included all of the mental limitations that were supported by the record in the RFC assessment which she incorporated in the hypothetical question posed to the vocational expert. The undersigned has already found that the ALJ did not properly evaluate Dr. Pearse's opinion, the teachers' reports or the "B" criteria of the mental listings. The undersigned therefore also finds substantial evidence does not support the ALJ's mental RFC.

The undersigned particularly notes the VE's testimony that all jobs would be eliminated if Plaintiff's and his stepfather's testimony was credible regarding "his difficulty with seemingly learning from past experience." The VE testified that "even in unskilled jobs that require a brief demonstration, that individual has to learn how to do it properly, and do it over and over again. And

46

it appears that from his testimony, supplemented by his stepfather, that he has difficulty doing that." This limitation is supported by Dr. Pearse's finding that Plaintiff's WAIS-III score indicated significantly below average work from memory, and his score on the Wonderlic test indicated "he would unlikely learn from a formalized training setting; would be in need of consistent supervision; and would have significant difficulty utilizing contingencies should an emergency arise in the work setting." It is also supported by Dr. Roman's finding that "his lowest score on the Verbal area was retention of information over time which fell down at the 2nd percentile." It is also supported by the teachers' reports, which stated, among others, that Plaintiff comprehended but appeared not to remember spoken instructions; he could not relate what was presented to written evaluation and had difficulty comprehending oral and written work; he got the concept only after "lots of practice;" and he had difficulty comprehending subject material. This particular alleged limitation on Plaintiff's ability to learn and retain information was not discussed in the decision, so the undersigned cannot determine whether substantial evidence supports the ALJ's RFC in this regard, and therefore finds it does not.

The undersigned notes that, even without adding any restrictions to those found by the ALJ, the VE testified there would be only 122 jobs available to Plaintiff in the regional economy. Although this number of jobs in the regional economy may represent a significant number of jobs, the ALJ miscalculated the number of jobs as testified to by the VE.[4] Therefore substantial evidence cannot

---

[4] The ALJ incorrectly found there would be 5,460 light security jobs nationally and 38 regionally Plaintiff could perform, whereas the VE testified those numbers must be halved– leaving 2,730 nationally and 19 regionally. The ALJ found there would be 7,558 sedentary packer jobs in the national economy and 5 at the regional economy, whereas the VE testified those numbers would also be cut by 50%- to 3,779 nationally, and 2 ½ regionally, which the VE referred to as "virtually no jobs as a packer."

support the ALJ's finding that there are a significant number of jobs in the national and regional economies that Plaintiff could perform. Upon remand the ALJ must determine whether, with the correct calculations, there are still a significant number of jobs in that national and local economy Plaintiff could perform. On the facts of this particular case, the small number of jobs in the regional economy become more crucial due to the undisputed fact that Plaintiff has never learned to drive, it has not been determined whether he would be able to learn to drive, and he has never lived outside his parents' home. It is therefore possible that 122 jobs in the regional economy may not be a significant number in this case, but this is for the Commissioner to determine on remand.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's RFC, her hypothetical to the VE, and resultantly, her determination that Plaintiff was not disabled at any time through the date of her decision.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by substantial evidence. I accordingly recommend that the Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED in part** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings as set forth above. See Melkonyan v. Sullivan, 501 U.S. 89, 111 S. Ct. 2157 (1991).

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the

basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this __16__ day of November, 2006.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE