IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RONALD L. ALLEN, JR.,

        Plaintiff,

v.                                    Civil Action No. 5:05CV199
                                                      (STAMP)
LINDA S. McMAHON,[1]
Acting Commissioner of
Social Security,

        Defendant.


**MEMORANDUM OPINION AND ORDER
AFFIRMING AND ADOPTING REPORT AND
RECOMMENDATION OF MAGISTRATE JUDGE**

I.  Procedural History

        The plaintiff, Ronald L. Allen, Jr., filed an action in this

Court on December 15, 2005, seeking judicial review of an adverse

decision by the defendant, Commissioner of Social Security,

pursuant to 42 U.S.C. § 405(g).  The case was referred to United

States Magistrate Judge John S. Kaull for submission of proposed

findings of fact and recommendation for disposition pursuant to 28

U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B).  The plaintiff filed a

motion for summary judgment on March 21, 2006.  The Commissioner

filed a cross-motion for summary judgment on April 20, 2006.

Magistrate Judge Kaull considered the plaintiff's and the

_____

        [1]Linda S. McMahon became the Acting Commissioner of Social
Security effective January 22, 2007, to succeed Jo Anne B.
Barnhart.  Under Federal Rule of Civil Procedure 25(d)(1) and 42
U.S.C. § 405(g), Linda S. McMahon is automatically substituted as
the defendant in this action.

Commissioner's motion for summary judgment and submitted a report and recommendation on November 16, 2006. In his report, the magistrate judge recommended that the plaintiff's motion for summary judgment should be GRANTED in part by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings as set forth in the report and recommendation. Further, the magistrate judge recommended that the Commissioner's motion for summary judgment should be denied.

Upon submitting his report, Magistrate Judge Kaull informed the parties that if they objected to any portion of his proposed findings of fact and recommendation for disposition, they must file written objections within ten days after being served with a copy of the report. To date, no objections have been filed by the parties.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court is required to make a <u>de novo</u> review of those portions of the magistrate judge's findings to which an objection is made. However, failure to file objections to the magistrate judge's proposed findings and recommendation permits the district court to review the recommendation under the standards that the district court believes are appropriate and under these circumstances the parties' right to <u>de novo</u> review is waived. <u>See</u> <u>Webb v. Califano</u>, 486 F. Supp. 825

(E.D. Cal. 1979).  Accordingly, this Court reviews the report and recommendation of the magistrate judge for clear error.

## II.  Facts

The plaintiff previously received Child's Insurance Benefits on the wage record of his father, Ronald L. Allen, Sr.  Those benefits were terminated due to the plaintiff's age and student status.

On August 15, 1980, the plaintiff, through his mother, Charlotte A. Allen, filed an application for supplemental security income benefits ("SSI") on his own behalf.  On December 22, 1983, Administrative Law Judge ("ALJ") Philip L. Moore found that the plaintiff's condition had significantly improved.  Thus, the ALJ found that the plaintiff was no longer disabled and the plaintiff's disability ceased in July 1983.  Consequently, the plaintiff's SSI income ended on September 30, 1983.

In December 1991, the plaintiff requested a review of his August 15, 1980 SSI action under guidelines promulgated in Zebley v. Sullivan, 493 U.S. 521 (1990), a case that mandated the expansion of the rules by which the Social Security Administration decided a child's claim.  On September 1, 1993, the plaintiff's review was granted and he was awarded SSI payments with the adjudication date of August 16, 1993.

On June 9, 1997, the plaintiff filed an application for Child's Insurance Benefits on the wage record of his father.  The

claim was denied initially and on reconsideration and a request for
hearing was timely filed.

Pursuant to then existing Public Law 104-193, when the
plaintiff attained the age of eighteen, his award of benefits was
re-determined to decide if he met the test for disability.
Plaintiff was notified on October 21, 1997, that he did not meet
the test for disability as an adult and that his last SSI payment
was scheduled for December 1997. However, the plaintiff elected to
receive continued benefits on his concurrent Title XVI and Title II
claims pending the outcome of his appeal of this re-determination.
A hearing on this determination was held on February 17, 1998, at
which the plaintiff, Lori Haggerty, the plaintiff's case manager at
United Summit Center, Charlotte Griffith, the plaintiff's mother
and Elsie Patterson, the plaintiff's great aunt, were present.
Steve Nicholson presided as the hearing officer. Plaintiff was
found to be not disabled and the decision to terminate plaintiff's
SSI benefits was affirmed on February 23, 1998. The plaintiff then
filed the present action.

### III.  Applicable Law

An ALJ's findings will be upheld if supported by substantial
evidence. See Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528
(4th Cir. 1998). Substantial evidence is that which a "'reasonable
mind might accept as adequate to support a conclusion.'" Hayes v.
Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990)(quoting Richardson v.

4

Perales, 402 U.S. 389, 401 (1971)).  Further, the "'possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'"  See Sec'y of Labor v. Mutual Mining, Inc., 80 F.3d 110, 113 (4th Cir. 1966)(quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

## IV.  Discussion

The plaintiff filed a motion for summary judgment asserting that: (1) the ALJ erred by failing to follow the directives set forth in the Appeals Council's remand order; (2) the ALJ erred by failing to properly consider the evidence in her findings regarding the Listing "B" and "C" criteria; and (3) the ALJ erred by rejecting the medical source opinions in favor of an Residual Functioning Capacity ("RFC") finding that fails to include all of the plaintiff's mental limitations.  In her motion for summary judgment, the Commissioner contends that the ALJ fully complied with the Appeals Council's remand order.  The Commissioner also asserted that the ALJ properly evaluated the evidence in finding that the plaintiff did not satisfy the Listing "B" or "C" criteria and that the mental limitations were supported by the record in the RFC assessment.

A.  Appeals Council

In his motion for summary judgment, the plaintiff first argues that the ALJ erred by failing to follow the directives set forth in

the Appeals Council's remand order.  In her motion for summary judgment, the Commissioner asserts that the ALJ fully complied with the Appeals Council's remand order.

On November 3, 2001, the Appeals Council granted the plaintiff's request for review of the original hearing decision, vacated the hearing decision and remanded the case to the ALJ for further proceedings.  The remand order in this case provided, in pertinent part, that:

Upon remand, the Administrative Law Judge <u>will</u>:

- Give consideration to the examining source opinion, pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p and explain the weight given to such evidence.  As appropriate, the Administrative Law Judge may request the treating and examining sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments (20 CRF 404.1512 and 416.912).  The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources.

- Obtain additional evidence concerning the claimant's mental impairments in order to complete the administrative record in accordance with regulatory standards concerning consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913).  The additional evidence may include, if warranted and available, a consultative psychiatric examination with psychological testing and medical source statements about what the claimant can still do despite the impairments.

- Further evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520a and 416.920a and document

application of the technique in the decision by
providing specific findings and appropriate
rationale for each of the functional areas
described in 20 CFR 404.1520a(c) and 416.920a(c).

- Give further consideration to the claimant's
maximum residual functional capacity and provide
appropriate rationale with specific references to
evidence in record in support of the assessed
limitations (20 CFR 404.1545 and 416.945 and Social
Security Rulings 85-16 and 96-8p).

- Further, if necessary, obtain evidence from a
medical expert to clarify whether the claimant's
impairments meet or equal the severity of an
impairment listed in Appendix 1, Subpart P.,
Regulations No. 4 (20 CFR 404.1527(f) and
416.927(f) and Social Security Ruling 96-6p).

The magistrate judge found that the second ALJ's opinion does

not comply with the Appeals Council's order. In the Appeals

Council's order, the ALJ was supposed to give consideration to and

explain the weight given by Ronald D. Pearse, Ed.D.'s opinion.[2]

After a careful review of the record, this Court finds that

the ALJ's decision does not indicate what weight, if any, the ALJ

accorded Dr. Pearse's opinion.

The Fourth Circuit in Gordon v. Schweiker, 725 F.2d 231, 235

(4th Cir. 1984), stated:

We cannot determine if findings are supported by
substantial evidence unless the Secretary explicitly
indicates the weight given to all of the relevant
evidence. See e.g., Myers v. Califano, 611 F.2d 980, 983
(4th Cir. 180; Stawls v. Califano, 596 F.3d 1209, 1213

_____

[2]The Appeals Council expressly noted its concern about the
inconsistencies in the IQs, Dr. Pearse's opinion that the plaintiff
would have difficulty working even in a sheltered workshop and the
differences in the teachers' assessments.

(4th Cir. 1979); <u>Arnold v. Secretary</u>, 567 F.2d 259 (4th Cir. 1977). As we said in <u>Arnold</u>: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

The ALJ reasoned that Dr. Pearse based his validity assessment on "historical information" but "did not specify which school intellectual assessments he had reviewed prior to rendering his opinion" and "the testing at the time of the [school] evaluations revealed IQ scores in the low average to average range." (Soc. Sec. Admin. Decision at 4, Nov. 18, 2002; Tr. at 39.) The ALJ further noted that "the latest [2002] WAIS-III testing resulted in scores well above those reported by Dr. Pearse." These reasons are the same reasons given in the previous ALJ decision that the Appeals Council found to be insufficient. The Appeals Council had stated that "[t]he [ALJ's] decision gives little weight to this report of testing, finding that since previous scores were significantly, higher, it is reasonable to treat the claimant as having the higher scores." (Order of Appeals Council at 1; Tr. at 1044.)

The only other reason the ALJ gives for dismissing Dr. Pearse's opinion is that, "in contrast to the detailed validity analysis report by the consultative evaluator when commenting on the validity of the claimant's IQ scores, Dr. Pearse failed to comment on the claimant's cooperation, or effort, or motivation during the testing." (Soc. Sec. Admin. Decision; Tr. at 39.)

The magistrate judge found that the ALJ had not resolved "the inconsistencies in the IQ testing. Further, the magistrate judge found that the IQ scores before 1996 are not considered totally reliable by the Social Security Administration. Listing 112.00D10, Pt. 404, Subpart P, App. 1 provides:

> [g]enerally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current . . . for 2 years . . . IQ tests obtained before age 7 are current for . . . 1 year . . . .

(Report and Recommendation at 33.)

Therefore, the IQ tests prior to 1996 are invalid indicators of the plaintiff's current status. Additionally, the Regulations, 20 C.F.R. § 404.1572 and § 416.927, require the use of the lowest score when multiple scores are obtained form one test, such as verbal, performance, and full scale, because "identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning." Although the tests used by the various examiners are all approved tests, the magistrate judge

determined that part of "reconciling" the various scores should include consideration of the different tests involved.

Significantly, the Listing requires only "<u>A</u>" valid verbal, performance, or full scale IQ of 60 through 70 . . . ." (emphasis added.) (Report and Recommendation at 33.)  In this civil action, the plaintiff has a verbal score of 70, which the examiner found was valid.  The United States Court of Appeals for the Fourth Circuit has not addressed the issue of which score should be used where there are multiple tests.

The magistrate judge found that the ALJ accorded Dr. Pearse's opinion little to no weight.

Based upon these reasons, this Court finds that the ALJ did not follow the Appeals Council's order with respect to the plaintiff's IQ testing.

Further, this Court finds that the ALJ failed to discuss the Wonderlic Personnel Test.  The Appeals Council noted Dr. Pearse's opinion that the plaintiff might not even be able to work in a sheltered workshop.  The ALJ compared Dr. Pearse's opinion regarding the plaintiff's ability to perform competitive work to Dr. VanAtta's opinion.  Dr. Pearse and Ralph E. VanAtta, Ph.D. are both examining psychiatrists.  Dr. VanAtta noted that there was a marked statistically and clinically significant difference between the plaintiff's verbal and performance IQ scores, and found that the plaintiff's comprehension subtest result, which he interpreted

as a measure of social intelligence, was "grossly deficient." (Tr. at 1082-84.) Dr. VanAtta diagnosed the plaintiff with Anxiety Disorder Secondary to Mild Cerebral Palsy, Borderline Intellectual Functioning, Social Isolation, and a Global Assessment of Functioning ("GAF") of 41 to 50.[3] The ALJ quotes only Dr. VanAtta's "Recommendation" that "[i]t would be a disservice to this young man to simply appraise him as being of borderline intellect and to fail to emphasize his strengths within the nonverbal domain" and his recommendation that the plaintiff be evaluated by vocational experts ("VE") "rather than determining him to be disabled at this point in his development." (Tr. 36-39.)

Dr. Pearse evaluated the plaintiff nearly a year after Dr. VanAtta. He found that the plaintiff met 12.05C based on his borderline intellectual functioning as well as his limited coping skills.[4] The magistrate judge found that Dr. Pearse's opinion would be better expressed as finding that the plaintiff "equaled" the listing, rather than meeting it. (Report and Recommendation at 35.) Dr. Pearse also gave the plaintiff the Wonderlic Test, which the ALJ failed to discuss. Since the ALJ failed to discuss this

---

[3]A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g. no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994).

[4]In other words, Dr. Pearse did not find that the plaintiff met Listing 12.05C based upon his IQ score alone.

evidence, this Court has no way of knowing the weight accorded to this test. This Court further notes that it does not know the weight that should be accorded to this test.

Dr. Pearse stated that the Wonderlic test is "a short form test of cognitive ability [that] describes the level at which an individual learns, understands instructions, and problem solves." (Tr. 1024.) He noted that a raw score of 12 was "considered to be the minimum score for an individual to work in an unskilled position with little supervision." (Id. at 1024-25.) The plaintiff obtained a raw score of 9. Dr. Pearse stated that this placed him below the 1st percentile in regard to the adult working population, and indicated that the plaintiff "would unlikely learn from a formalized training setting; would be in need of consistent supervision; and would have significant difficulty utilizing contingencies should an emergency arise in a work setting." (Id.) It is in this context that Dr. Pearse stated that the plaintiff's "best fit" in regard to employment is a sheltered workshop. (Id.) He then added that, "given his lack of social skills he would likely have difficulty even in that type of setting." (Id.)

The ALJ failed to discuss the Wonderlic test, which was in large part the basis for Dr. Pearse's opinion regarding the plaintiff's ability to perform work. The ALJ also did not discuss Dr. Pearse's opinion regarding the plaintiff's need for

supervision, difficulty learning and significant difficulty dealing with emergencies.

This Court finds that evidence from other sources in the record supports Dr. Pearse's opinion. The 1996 IQ test, given by Frank D. Roman, Ed.D. indicated that the plaintiff's lower score in the verbal area was for retention of information over time, at which he scored in the 2nd percentile. He also had a very low score in a section called "freedom from distractability," which is based upon auditory math reasoning and digit span. (Tr. at 864-66.) The record reveals that the plaintiff had difficulty repeating numbers forwards and backwards. Dr. Roman recommended exploring the possibility of transferring the plaintiff to the United Technical Center to see what can be done for him with respect to his auditory math reasoning and digit span. In his opinion, the typical classroom setting was not conducive for the plaintiff. Dr. Roman stated that the plaintiff will probably be "lost if he has to maintain a traditional classroom setting." Further, the plaintiff was receiving all "F's" in his classes, except for physical education. (Id.)

This Court finds that the ALJ did not give consideration and did not explain the weight given to Dr. Pearse's opinion as ordered by the Appeals Council. This Court further finds that the ALJ did not resolve the differences in teacher assessments as required by the Appeals Council based upon the evidence stated below.

In 1997, the plaintiff's English teacher noted that the plaintiff was not even at grade level in the special education setting. He could not stay on task and sometimes wandered around the classroom. He was not keeping up with the class pace and needed special attention. He did not complete assignments without constant encouragement. He did not relate to and was not on the same maturity level as his peers. He comprehended but appeared not to remember spoken instructions. He also did not appear to have reciprocal friendships, and was usually alone during breaks and lunch, although he did relate to the teacher "on a limited level." (Tr. at 590-601.) Further, he was mannerly and cooperative, but did not follow through with instructions, needing one-on-one attention, even in the small, structured special education class.

In a questionnaire form, the plaintiff's science teacher stated that same year that she worked with the plaintiff on a one-on-one basis. During this time, the teacher found that he worked to his potential as a learning disabilities student. He kept up with the class pace, "but the entire class is being remediated." (Id.) He was unable to relate what was presented to written evaluation and had difficulty comprehending oral and written work. He completed only part of his assignments. While he had good keyboarding skills and enjoyed computer-assisted instruction, he could not complete assignments without assistance. He had poor communication skills and difficulty trying to formulate questions.

He related well to the teacher and had "adequate interaction with other students, but is a 'loner.'" (Id.)  He was occasionally distracted by other students and needed help staying on task.  However, he stayed on task if the assignment was computer generated.  Further, the teacher wrote that the plaintiff had very low self-esteem and appeared backwards in social interactions.  For example, the teacher stated that he was a loner who ate lunch by himself if he ate at all.  Finally, the teacher stated that he was very likeable, but immature for his age.

That same year, the plaintiff's math teacher wrote in a questionnaire form that the  plaintiff was in a lower-level class with only five other students.  He was "slower" but did get the concept "after lots of practice." (Id.)  He stayed on task, but still did not complete all his work in a given time.  He needed to be encouraged to keep up.[5]  He was "very weak" in communication skills.  He spoke slowly and precisely to her, but "with his peers, he hesitates or doesn't respond.  He is a loner in the mornings and lunchtime." (Id.)  He had no friends that he related to and stayed very quiet and to himself.  He sometimes "drift[ed] off" and he was "easily distracted." (Id.) Some days he was "disoriented mentally as far as staying on task." (Id.)

---

[5]However, the teacher stated that he always finished his work, just not in the time provided.

Another teacher wrote that the plaintiff was in a class of six students and accomplished only about 50 percent of what his classmates did. He spelled on the 2nd or 3rd grade level and read on a 3rd or 4th grade level. He enjoyed high interest books on his level. He tried hard but worried constantly and needed support and encouragement about every ten minutes. The teacher further stated that he had improved socially, "but still had a long way to go." (Id.) For example, nine months earlier he would not even try to talk or socialize, but now he did try, speaking softly in short, choppy sentences. When the teacher was asked how the plaintiff related to her, if he related appropriately with other children, and if he had reciprocal friendships, the teacher wrote only that he "relates well and wants to spend additional free time with me." He tried hard and his only behavioral problem was "craving attention." (Id.) Finally, the teacher stated that the plaintiff became distracted "very easily." (Id.)

The plaintiff's teacher stated in a questionnaire form that the plaintiff was mainstreamed in her class, however, where he was not working at grade level. He had a hard time keeping up and did not read on that grade level. He completed assignments most of the time but needed more cuing than other students to complete the work. The teacher further stated that he related to the teacher fine and "peer relationships" were "somewhat" reciprocal. (Id.) Finally, the teacher found that he was cooperative and had no

16

specific problems with attention, concentration and distractability.

One other teacher stated in a questionnaire form that the plaintiff was in a remediation class with ten other students and a computer applications class with five other students. He was working at grade level in this remediation class and stayed on task, "but had difficulty comprehending subject material." (Id.) The teacher stated that he kept on task in his learning disabilities classes, but had difficulty with cognitive areas. He completed assignments with positive reinforcement. He appeared to have difficulty expressing himself, not because of a speech abnormality, but because of a difficulty with identifying and articulating what he wanted to say. Further, the teacher stated that he had a good relationship with the teacher and fellow students during class, but appeared to be "very timid, at time[s] withdrawn." (Id.) He ate lunch alone and lacked mature social skills. Finally, the teacher stated that he stayed on task with no attention problems and his difficulty was "in understanding material presented." (Id.)

The magistrate judge stated that he disagreed with the ALJ's opinion that the reports discussed above established that the plaintiff "related adequately to teachers and classmates [but] chose to be a 'loner' while in school [and] establish[ed] that the claimant was able to keep up with the pace in most of his special

education classes, but that he had to be encouraged to complete assignments in a timely manner." (Report and Recommendation at 38.)

After a review of the record, this Court finds that the ALJ did not follow the Appeals Council's direction in "resolving" the teachers' reports and also finds substantial evidence does not support her conclusions regarding the teachers' reports. (Id.)

Further, this Court finds that the ALJ did not err in failing to obtain a Medical Expert ("ME"). However, this Court notes that it would have been helpful in reconciling the IQ scores. This court notes that the Appeals Council did not order the ALJ to retain a ME, but directed the ALJ to obtain evidence from a ME to clarify whether the plaintiff's impairments meet or equal a listing, if necessary. Based upon this order, this Court finds that the Appeals Council ordered the ALJ to use its discretion regarding retention of a ME. Further, this Court notes that the regulations do not require the ALJ to obtain a ME. See 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii).

B. Listing "B" and "C" for Mental Impairments

In his motion for summary judgment, the plaintiff argues that the ALJ erred by failing to properly consider the evidence in making her findings regarding the Listing "B" and "C" criteria. The Commissioner contends that the ALJ properly evaluated the

evidence in finding that the plaintiff did not satisfy the Part "B" or "C" criteria under the relevant listings for mental impairments.

The ALJ found that the plaintiff had severe impairments of cerebral palsy, borderline intellectual functioning, and an adjustment disorder with depressed mood. The ALJ then determined that none of the plaintiff's impairments, considered singly or in combination, met or equaled any listing. The magistrate judge had already found, and this Court agrees that the ALJ erred in considering and reconciling the plaintiff's various IQ scores. Therefore, this Court finds that substantial evidence does not support the ALJ's finding that the plaintiff does not meet or equal Listings 12.05C or 11.07.

Further, this Court finds substantial evidence does not support the ALJ's findings under the "B" criteria of the psychological listings. As the ALJ herself states:

> The first area of the "B" criteria, "activities of daily living," includes adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office.

(Tr. 36-49.)

A review of the record indicates that the plaintiff did almost none of these things. This does not mean that he could not do them, only that there is no evidence to support the ALJ's finding that he had only a "mild" limitation in this area. Further, the ALJ supported her findings by stating:

At the time of the consultative examination on September 25, 1997, the claimant's activities included attending school. He reported that after school he ate dinner and watched television (Exhibit B-7F).[6] The claimant reported to Dr. Fremouw at the time of the consultative evaluation on August 8, 2001 that he spent much of his time watching television or playing Nintendo. He reported that he walked to the store, helped his mother around the house, and did the yard work for his mother (Exhibit B-17F). He reported similar activities at the time of the consultative evaluation on June 19, 2002 (Exhibit B-21F).[7]

(Tr. 36-49.)

This Court finds that this evidence does not support the ALJ's finding that the plaintiff had only a "mild" impairment in the area of "activities of daily living." (Id.) Significantly, in 1997,[8] the plaintiff was referred to United Summit Center because of

---

[6]The "Daily Activities" portion of the 1997 report actually states only:

The claimant reports that he will watch TV and he generally does not sit at the dinner table but is usually "piecing." The claimant's mother states she prepares an evening meal but "Ron just picks." The claimant reports he goes to bed between 9:00 and 10:00 p.m. He reports no activities with friends outside of school. The mother reports "he's a shy kid, he hangs to himself. He's not much for groups."

[7]The "Daily Activities" portion of the 2002 report actually states:

I get up and watch TV. Sometimes I eat breakfast and sometimes I don't. I just sit and watch TV all day most of the time. Sometimes I go to visit my aunt and a couple of people. I watch TV in the evening then I get ready for bed. Sometimes I just lay back down for a few hours. I listen to the radio all night long.

[8]The plaintiff was 18 years old in 1997.

academic problems due to attention deficit disorder and learning disabilities, socialization problems and "to assist him in daily living skills." (Id.) He had a community support worker "for transportation and supplementation of services." (Id.) He received one-on-one basic living skills training for purchasing clothing.

Psychologist Yost found that the evidence indicated that the plaintiff might not be competent to manage his finances if provided with an allowance. In 2002,[9] Thomas E. Andrews, Ph.D. found the plaintiff's personal hygiene was "marginally clean." (Tr. at 1142-47.) At the time of the hearing, the plaintiff was a 23-year-old man who had never learned to drive a car and rarely left his mother's house. He did not prepare meals, clean his room, do laundry, do chores, go shopping, or go out with friends, and his only reported hobby was watching television. Plaintiff's stepfather testified that the plaintiff had never washed clothes, and he did not think the plaintiff knew how. He testified that the plaintiff dressed sloppily and did not seem to care. The people from United Summit Center came to the plaintiff's house to teach the plaintiff basic living skills. The stepfather testified that as long as they were there telling the plaintiff what to do, he would do it. But after awhile he relapsed, "like he went off . . . in a world of his own, when none of it mattered." (Id.)

_____

[9]In 2002, the plaintiff was 22 years old.

Whether this lack of daily activities is due to a mental disorder or lack of motivation, this Court finds that it does not support a finding that the plaintiff had only a "mild" restriction of daily activities.

Similarly, this Court finds that the evidence does not support the ALJ's finding that the plaintiff had only a "moderate" impairment of social functioning. Plaintiff's teachers for the most part found the plaintiff to be a "loner." His English teacher said he did not relate to his peers, was not on the same maturity level as his peers, and did not appear to have any reciprocal friendships. He was usually alone during breaks and lunch, although he did relate to her "on a limited level." (Tr. at 590-601.) His science teacher stated that the plaintiff had very low self-esteem and appeared backwards in social interactions. He was a loner who ate lunch by himself if he ate at all. He was very likeable, but immature for his age. His math teacher stated the plaintiff spoke slowly and precisely to her, but "with his peers, he hesitates or doesn't respond. He is a loner in the mornings and at lunchtime." (Id.) He had no friends that he related to and stayed very quiet and to himself. Plaintiff's learning disabilities teacher wrote that he had improved socially, "but still ha[d] a long way to go." (Id.) Another teacher stated that the plaintiff appeared to have difficulty expressing himself. The teacher stated it was not a speech abnormality, but difficulty with

22

identifying and articulating what he wanted to say. He had a good relationship with the teacher and fellow students during class, but appeared to be "very timid, at time[s] withdrawn." (Id.) He ate lunch alone and lacked mature social skills. Finally, one teacher stated that the plaintiff's "peer relationships" were "somewhat" reciprocal. (Id.) These statements do not support the ALJ's finding that the plaintiff's "teachers reported that the claimant . . . related adequately to teachers and classmates [but] chose to be a loner while in school."

Plaintiff was referred to United Summit Center in part due to "socialization problems with peers and family." (Tr. at 1082-84.) In 1997, psychologist Yost found the plaintiff was "somewhat socially isolated." (Tr. at 36-49.) In 2001, Dr. Fremouw found that the plaintiff had good social functioning during the evaluation, but also that the plaintiff did not go to church or any clubs, did not date, and only "saw relatives, such as his sister." A year later, the plaintiff reported to Dr. Andrews that he ate out in restaurants twice a week, visited with friends and/or relatives three times a week, and talked with neighbors once a day. According to the plaintiff and his stepfather's testimony, the "restaurants" were mostly "Burger King," where he went with his parents, and the "friends and relatives" he visited were apparently people his parents knew and went to visit. Plaintiff just went along with them. Plaintiff's stepfather testified that the

plaintiff liked to "go uptown," but explained that meant that he drove the plaintiff to the library where the plaintiff "sits on the computer" and then picked him back up and drove him home. (Id.) He testified that the plaintiff did recently start visiting a girl he knew from school about once every two weeks.

This Court finds that the ALJ's determination that the plaintiff had only a moderate restriction of social functioning is not supported by substantial evidence.

Regarding "concentration, persistence, and pace," again the ALJ referred to the plaintiff's teachers' reports in finding that the plaintiff was "moderately" limited. (Id.) As stated above, the plaintiff's English teacher noted that the plaintiff was not even at grade level in the special education setting. He could not stay on task, sometimes wandered around the classroom, and needed special attention.[10]

As stated above, the plaintiff's science teacher,[11] who worked with the plaintiff on a one-to-one basis, found that the plaintiff worked to his potential as a learning disabilities student, kept up

---

[10]As stated above, the teacher found that the plaintiff comprehended but appeared not to remember spoken instructions, did not follow through with instructions, and needed one-on-one attention, even in the small, structured special education class.

[11]As previously noted, the teacher also stated that the plaintiff completed only part of his assignments, had good keyboarding skills and enjoyed computer-assisted instruction, but could not complete assignments without assistance. Finally, the teacher stated that he was occasionally distracted by other students and needed help staying on task.

with the remediated class pace, could not relate what was presented to written evaluation and had difficulty comprehending oral and written work.

Plaintiff's math teacher[12] found, as stated above, that the plaintiff was slower than other students but did eventually get the concept after a lot of practice.[13] As previously stated, this teacher found that "[s]ome days he [was] disoriented mentally as far as staying on task." (Tr. at 590-601.)

As stated above, another teacher wrote that the plaintiff was in a class of six students, and accomplished only about 50 percent of what his classmates did. He spelled on the 2nd or 3rd grade level and read on the 3rd or 4th grade level. (Id.) He enjoyed high interest books "on his level." He tried hard but worried constantly and needed support and encouragement about ever ten minutes. He became distracted "very easily." (Id.)

As previously noted, the plaintiff's history teacher found that the plaintiff was mainstreamed in her history class, where he was not working at grade level. The teacher stated that the plaintiff had a hard time keeping up, did not read on the same

---

[12]The plaintiff was in a lower-level class with five other students.

[13]The teacher found that the plaintiff stayed on task, but still did not complete all his work in a given time and needed to be encouraged to keep up. The teacher further stated that the plaintiff always finished his work, just not in the time period, sometimes "drift[ed] off" and was "easily distracted." (Tr. 590-601.)

level as other students, completed assignments most of the time but needed more cuing to complete the work and had no specific problems with attention, concentration or distractability.

Finally, as stated above, another teacher found that the plaintiff was working at grade level in his remediation class, stayed on task, "but had difficulty comprehending subject material," kept on task in his learning disabilities classes but had difficulty with cognitive areas and completed assignments with positive reinforcement. (Id.)

The ALJ found that the reports from the plaintiff's teachers establish that the plaintiff was able to keep up with the pace of most of his special education classes, but that he had to be encouraged to complete assignments in a timely manner. The magistrate judge found, and this Court agrees that the reports do not support this statement.

Psychologist Yost found that the plaintiff's concentration was "somewhat impaired." (Tr. at 36-49.) Dr. Pearse found the plaintiff's concentration was "limited;" and Dr. Fremouw and Dr. Andrews found the plaintiff had only a mild impairment of concentration. (Id.) As the United States Court of Appeals for the Fourth Circuit stated in Hays v. Sullivan, 907 F.2d 1453 (4th Cir. 1990):

> [u]ltimately, it is the duty of the administrative law
> judge reviewing the case, and not the responsibility of
> the courts, to make findings of fact and to resolve
> conflicts in the evidence. King v. Califano, 599 F.2d

597, 599 (4th Cir. 1979)("This Court does not find facts or try the case <u>de novo</u> when reviewing disability determinations."); <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir. 1976)("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); <u>Blalock v. Richardson</u>, 483 F.2d at 774 ("The language of § 205(g) precludes a <u>de novo</u> judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'").

This Court finds that there are conflicts in the evidence regarding the plaintiff's limitations of concentration, persistence and pace. As stated in <u>Hays</u>, it is the ALJ's responsibility, not the court's, to reconcile these inconsistencies. This Court does not find that substantial evidence supports the ALJ's determination that the plaintiff had only "moderate" limitations of concentration, persistence or pace because the teacher reports fail to support the ALJ's interpretation of the reports, and because the ALJ failed to consider Dr. Pearse's evaluation.

This Court finds that substantial evidence supports the ALJ's determination that the plaintiff did not meet the "C" criteria of the mental listings. As the ALJ found, there is no evidence in the record that the plaintiff experienced repeated episodes of decompensation, each of extended duration, or a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or changes in the environment would be predicated to cause the plaintiff to decompensate. In his

motion for summary judgment, the plaintiff argues that he meets the third criterion, which provides that he must have a current history of one or more years of inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. (Pl.'s Mot. for Summ. J. at 16.)

The plaintiff argues that he spent his entire lifetime in a highly supportive living environment, whether it be his very intimate special education classes, the one-on-one behavioral management classes, or "the nurturing environment of his mother's home." (Id.) This Court first notes that there is no examining, non-examining or treating psychologist in the record who found that the plaintiff needed to live in a "highly structured environment." (Id.) Second, this Court finds that the plaintiff did manage to attend school, even though in small, special education classes. Further, although the plaintiff argues that he did not leave his "home environment," there is no evidence in the record that he was not able to leave. (Id.)

Accordingly, this Court finds that substantial evidence support the ALJ's finding that the plaintiff did not meet the "C" criteria of Listing 12.04.

C.  Medical Source Opinions

In his motion for summary judgment, the plaintiff argues that the ALJ erred by rejecting the medical source opinions in favor of a RFC finding that fails to include all of the plaintiff's mental

limitations. In her motion for summary judgment, the Commissioner argues that the ALJ included all of the mental limitations that were supported by the record in the RFC assessment which she incorporated into the hypothetical question posed to the VE. This Court found above that the ALJ did not properly evaluate Dr. Pearse's opinion, the teachers' reports or the "B" criteria of the mental listings. This Court also finds that substantial evidence does not support the ALJ's mental RFC.

This Court notes that the VE's testimony that all jobs would be eliminated if the plaintiff and his stepfather's testimony was credible regarding "his difficulty with seemingly learning from past experience." (Id.) The VE testified that "even in unskilled jobs that require a brief demonstration, that individual has to learn how to do it properly, and do it over and over again. And it appears from his testimony, supplemented by his stepfather, that he has difficulty doing that."

This limitation is supported by Dr. Pearse's finding that the plaintiff's WAIS-III score indicated significantly below average work from memory, and his score on the Wonderlic test indicated that "he would unlikely learn from a formalized training setting; would be in need of consistent supervision; and would have significant difficulty utilizing contingencies should an emergency arise in the work setting." (Report and Recommendation at 47.) It is also supported by Dr. Roman's finding that "his lowest score on

the Verbal area was retention of information over time which fell down at the 2nd percentile." (Tr. at 864-66.) It is also supported by the teachers' reports, which stated, among other things, that the plaintiff comprehended but appeared not to remember spoken instructions; he could not relate what was presented to a written evaluation and had difficulty comprehending oral and written work; he got the concept only after a lot of practice; and he had difficulty comprehending subject material. This particular alleged limitation on the plaintiff's ability to learn and retain information was not discussed in the decision, thus, this Court is unable to determine whether substantial evidence supports the ALJ's RFC in this regard. Accordingly, this Court is unable to find that substantial evidence supports the ALJ's RFC.

This Court notes that, even without adding any restrictions to those found by the ALJ, the VE testified there would be only 122 jobs available to the plaintiff in the regional economy. Although the number of jobs in the regional economy may represent a significant number of jobs, the ALJ miscalculated the number of jobs as testified to by the VE.[14] For these reasons, this Court

_____

[14]The ALJ incorrectly found that there would be 5,460 light security jobs nationally and 38 regionally which the plaintiff could perform, whereas the VE testified those numbers must be divided in half -- that would leave 2,370 nationally and 19 regionally. The ALJ found there would be 7,558 sedentary packer jobs in the national economy and five at the regional economy, whereas the VE testified those numbers would also be divided by 50

finds that substantial evidence does not support the ALJ's finding that there are a significant number of jobs in the national and regional economies that the plaintiff could perform.

Upon remand, the ALJ must determine whether, with the correct calculations, there are still a significant number of jobs in that national and local economy which the plaintiff could perform. On the facts of this particular case, the small number of jobs in the regional economy become more crucial due to the undisputed fact that the plaintiff has never learned to drive[15] and he has never lived outside his parent's home. It is therefore possible that 122 jobs in the regional economy may not be a significant number in this case, but this is for the ALJ to determine on remand.

For the above reasons, this Court finds substantial evidence does not support the ALJ's RFC, the ALJ's hypothetical to the VE, and the ALJ's determination that the plaintiff was not disabled at any time through the date of the ALJ's decision.

## V. Conclusion

Because the parties have not objected to the proposed findings of fact and recommendation for disposition, and because this Court finds that the recommendation is not clearly erroneous, this Court

---

percent. Thus, there would be 3,779 jobs nationally and two and one half regionally, which the VE referred to as "virtually no jobs as a packer." (Report and Recommendation at 47.)

[15]It has not been determined whether he would be able to learn to drive.

hereby ACCEPTS and ADOPTS the magistrate judge's report and recommendation in its entirety. For the reasons stated above, it is ORDERED that plaintiff's motion to summary judgment is hereby GRANTED IN PART by reversing the Commissioner's decision under sentence four of 42 U.S.C. § 405(g) and 1383(c)(3) and this civil action is REMANDED to the Commissioner for further proceedings as set forth above. It is hereby ORDERED that the Commissioner's motion for summary judgment is hereby DENIED.

It is further ORDERED that, pursuant to 42 U.S.C. § 405, this civil action be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.

DATED:   March 28, 2007


                              /s/ Frederick P. Stamp, Jr.
                              FREDERICK P. STAMP, JR.
                              UNITED STATES DISTRICT JUDGE